No. 21-50826

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LIMITED;
CONSUMER SERVICE ALLIANCE OF TEXAS,

*Plaintiffs-Appellants*,

v.

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT CHOPRA, IN HIS
OFFICIAL CAPACITY AS DIRECTOR, CONSUMER FINANCIAL PROTECTION
BUREAU,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Texas (Yeakel, J.)

---

## PETITION FOR REHEARING EN BANC

---

Christian G. Vergonis
Brinton Lucas
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939
cvergonis@jonesday.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

*Community Financial Services Association of America, Ltd. et al. v. Consumer Financial Protection Bureau et al.*,
No. 21-50826

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. Plaintiff-Appellant **Community Financial Services Association of America, Ltd.** (CFSA), which has no parent corporation. No publicly held company owns 10% or more of its stock.

2. Plaintiff-Appellant **Consumer Service Alliance of Texas** (CSAT), which has no parent corporation. No publicly held company owns 10% or more of its stock.

3. Defendant-Appellees **Consumer Financial Protection Bureau** (CFPB or Bureau); **Rohit Chopra, in his official capacity as Director, Consumer Financial Protection Bureau**.

4. Former Defendants-Appellees **David Uejio, in his official capacity as Acting Director, Consumer Financial Protection Bureau; John Michael Mulvaney, in his official capacity as Acting Director, Consumer Financial**

**Protection Bureau; Kathleen Kraninger, in her official capacity as Director, Consumer Financial Protection Bureau.**

5. The following law firms and counsel have participated in the case, at any stage of the litigation:

| **Plaintiffs-Appellants** | **Counsel** |
|---|---|
| Community Financial Services Association of America, Ltd.; Consumer Service Alliance of Texas | Michael A. Carvin<br>Christian G. Vergonis<br>Brinton Lucas<br>H. Hunter Bruton<br>Alexis Zhang<br>JONES DAY<br>51 Louisiana Ave., N.W.<br>Washington, DC 20001<br><br>Laura Jane Durfee<br>JONES DAY<br>2727 North Harwood St., Suite 500<br>Dallas, TX 75201 |

| **Defendants-Appellees** | **Counsel** |
|---|---|
| Consumer Financial Protection Bureau; David Uejio, in his official capacity as Director, Consumer Financial Protection Bureau Terminated: 10/12/2021; Rohit Chopra, in his official capacity as Director, Consumer Financial Protection Bureau; Kathleen Kraninger, in her official capacity as Director, Consumer Financial Protection Bureau Terminated: 09/15/2021 | Stephen Van Meter<br>  *Acting General Counsel*<br>Steven Y. Bressler<br>  *Acting Deputy General Counsel*<br>Mary McLeod<br>  *Former General Counsel*<br>John R. Coleman<br>  *Former Deputy General Counsel*<br>Kevin E. Friedl<br>Kristin Bateman<br>Karen S. Bloom<br>Nandan M. Joshi<br>CONSUMER FINANCIAL PROTECTION BUREAU |

| | |
|---|---|
| | 1700 G Street, N.W.<br>Washington, DC 20552 |
| ***Amici Curiae***<br>Public Citizen, Inc.;<br>Americans for Financial Reform<br>Education Fund;<br>Center for Responsible Lending;<br>National Consumer Law Center | **Counsel**<br>Aaron Michael Johnson<br>EQUAL JUSTICE CENTER<br>510 S. Congress Avenue, Suite 206<br>Austin, TX 78704<br><br>Rebecca Smullin<br>PUBLIC CITIZEN LITIGATION GROUP<br>1600 20th Street NW<br>Washington, DC 20009 |
| Third Party Payment Processors<br>Association | Keith J. Barnett<br>Timothy A. Butler<br>Elizabeth P. Waldbeser<br>TROUTMAN PEPPER HAMILTON<br>SANDERS, LLP<br>600 Peachtree Street, N.E., Suite<br>3000<br>Atlanta, GA 30308-2216 |
| **Movant**<br>Cooperative Baptist Fellowship | **Counsel**<br>Rebecca Smullin<br>PUBLIC CITIZEN LITIGATION GROUP<br>1600 20th Street NW<br>Washington, DC 20009<br><br>Aaron Michael Johnson<br>EQUAL JUSTICE CENTER<br>510 S. Congress Avenue, Suite 206<br>Austin, Texas 78704 |
| **Petitioner (No. 22-448)**<br>Consumer Financial Protection<br>Bureau, et al. | **Counsel**<br>Elizabeth B. Prelogar<br>Brian M. Boynton<br>Brian H. Fletcher<br>Benjamin W. Snyder<br>Ephraim A. McDowell |

UNITED STATES DEPARTMENT OF
JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Seth Frotman
Steven Y. Bressler
Kristin Bateman
Christopher Deal
Kevin E. Friedl
Justin M. Sandberg
Stephanie Garlock
CONSUMER FINANCIAL
PROTECTION BUREAU
Washington, DC 20552

| | |
|---|---|
| **Respondents (No. 22-448)** | **Counsel** |
| Community Financial Services Association of America, Limited, et al., | Noel J. Francisco |
| | Christian G. Vergonis |
| | Hashim M. Mooppan |
| | Yaakov M. Roth |
| | Brinton Lucas |
| | Thomas Hopson |
| | Alexis Zhang |
| | JONES DAY |
| | 51 Louisiana Ave., NW |
| | Washington, DC  20001 |

| | |
|---|---|
| ***Amici Curiae* (No. 22-448)** | **Counsel** |
| States of West Virginia and 15 Other States | Lindsay Sara See |
| | Patrick Morrisey |
| | Michael R. Williams |
| | Grant A. Newman |
| | OFFICE OF THE WEST VIRGINIA |
| | ATTORNEY GENERAL |
| | State Capitol Complex |
| | Building 1, Room E-26 |
| | Charleston, WV 25305 |

iv

Steven Marshall
*Attorney General, State of Alabama*

Kris Kobach
*Attorney General, State of Kansas*

Treg Taylor
*Attorney General, State of Alaska*

Daniel Cameron
*Attorney General, Commonwealth of Kentucky*

Tim Griffin
*Attorney General, State of Arkansas*

Jeff Landry
*Attorney General, State of Louisiana*

Ashley Moody
*Attorney General, State of Florida*

Lynn Fitch
*Attorney General, State of Mississippi*

Chris Carr
*Attorney General, State of Georgia*

Andrew Bailey
*Attorney General, State of Missouri*

Raúl Labrador
*Attorney General, State of Idaho*

Austin Knudsen
*Attorney General, State of Montana*

Todd Rokita
*Attorney General, State of Indiana*

Michael T. Hilgers
*Attorney General, State of Nebraska*

Brenna Bird
*Attorney General, State of Iowa*

John M. Formella
*Attorney General, State of New Hampshire*

Drew Wrigley
*Attorney General, State of North Dakota*

Jason Miyares
*Attorney General, Commonwealth of Virginia*

Dave Yost
*Attorney General, State of Ohio*

Bridget Hill
*Attorney General, State of Wyoming*

Gentner Drummond
*Attorney General, State of Oklahoma*

Alan Wilson
*Attorney General, State of South Carolina*

Marty Jackley
*Attorney General, State of South Dakota*

Jonathan Skrmetti
*Attorney General and Reporter, State of Tennessee*

John Scott
*Provisional Attorney General, State of Texas*

Sean D. Reyes
*Attorney General, State of Utah*

States of New York, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and Wisconsin, and the District of Columbia

Letitia James
*Attorney General, State of New York*
Barbara D. Underwood
*Solicitor General*
Ester Murdukhayeva
*Deputy Solicitor General*
Dennis Fan
*Senior Assistant Solicitor General*
28 Liberty Street
New York, NY 10005

Kris Mayes
*Attorney General, State of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004

Rob Bonta
*Attorney General, State of California*
1300 I St.
Sacramento, CA 95814

Aaron M. Frey
*Attorney General, State of Maine*
6 State House Station
Augusta, ME 04333

Philip J. Weiser
*Attorney General, State of Colorado*
1300 Broadway, 10th Fl.
Denver, CO 80203

Anthony G. Brown
*Attorney General, State of Maryland*

Brain E. Frosh
*Attorney General, State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

William Tong
*Attorney General, State of Connecticut*
165 Capital Ave.
Hartford, CT 06106

Andrea Joy Campbell
*Attorney General, Commonwealth of Massachusetts*
Maura Healey
*Attorney General, Commonwealth of Massachusetts*
One Ashburton Pl.
Boston, MA 02108

Kathleen Jennings
*Attorney General, State of Delaware*
820 N. French St.
Wilmington, DE 1980

Dana Nessel
*Attorney General, State of Michigan*
P.O. Box 30212
Lansing, MI 48909

Anne E. Lopez
*Attorney General, State of Hawaii*
Holly T. Shikada
*Attorney General, State of Hawaii*
425 Queen St.
Honolulu, HI 96813

Keith Ellison
*Attorney General, State of Minnesota*
75 Rev. Dr. Martin Luther King Jr. Blvd.

St. Paul, MN 55155

Kwame Raoul
*Attorney General, State of Illinois*
100 West Randolph St.
Chicago, IL 60601

Aaron D. Ford
*Attorney General, State of Nevada*
100 North Carson St.
Carson City, NV 89701

Matthew J. Platkin
*Attorney General, State of New Jersey*
25 Market St.
Trenton, NJ 08625

Peter F. Neronha
*Attorney General, State of Rhode Island*
150 S. Main St.
Providence, RI 02903

Raúl Torrez
*Attorney General, State of New Mexico*
Hector Balderas
*Attorney General, State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

Robert W. Ferguson
*Attorney General, State of Washington*
P.O. Box 40100
Olympia, WA 98504

Josh Stein
*Attorney General, State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

Josh Kaul
*Attorney General, State of Wisconsin*
17 W. Main Street
Madison, WI  53703

Ellen F. Rosenblum
*Attorney General, State of Oregon*
1162 Court St. NE
Salem, OR 97301

Brian L. Schwalb
*Attorney General, District of Columbia*
Karl A. Racine
*Attorney General, District of Columbia*
400 6th St., NW
Washington, DC 20001

Michelle A. Henry
*Attorney General, Commonwealth of Pennsylvania*
Josh Shapiro
*Attorney General, Commonwealth of Pennsylvania*
Strawberry Sq.
Harrisburg, PA 17120

Charity R. Clark
*Attorney General, State of Vermont*
109 State St.
Montpelier, VT 05609

Community Development Financial Institutions and Credit Unions including Self-Help Credit Union, The Center for Responsible Lending, and National Association of Latino Community Asset Builders

Richard A. Koffman
Emmy L. Levens
Zachary I. Krowitz
Trent M. Rehusch
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW
Washington, DC 20005

|                                                                                                                                                                                                                                              | Claire L. Torchiana<br>COHEN MILSTEIN SELLERS & TOLL PLLC<br>88 Pine Street<br>New York, NY 10005                                                                                                                                   |
|---|---|
| Professors of History and Constitutional Law                                                                                                                                                                                                 | Elizabeth B. Wydra<br>Brianne J. Gorod<br>Brian R. Frazelle<br>J. Alexander Rowell<br>CONSTITUTIONAL ACCOUNTABILITY CENTER<br>1200 18th Street NW, Suite 501<br>Washington, DC 20036                                                |
| Lawyers Committee for Civil Rights under Law, Housing Clinic of Jerome N. Frank Legal Services of Organization at Yale Law School, Leadership Conference on Civil and Human Rights, National Fair Housing Alliance, Unidosus, et al.          | Damon Hewitt<br>Jon Greenbaum<br>Thomas Silverstein<br>Malcolm Peyton-Cook<br>Sophia Jayanty<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, NW Suite 900<br>Washington, DC 20005                                |
|                                                                                                                                                                                                                                              | Jeffrey Gentes<br>JEROME N. FRANK LEGAL SERVICES ORGANIZATION<br>Yale Law School<br>127 Wall Street<br>New Haven, CT 06511                                                                                                          |
| Military and Veterans Organizations                                                                                                                                                                                                          | Carolyn E. Shapiro<br>John Paul Schnapper-Casteras<br>Rachael R. Yocum<br>SCHNAPPER-CASTERAS PLLC<br>1717 K Street NW, Suite 900<br>Washington, DC 20006                                                                            |

| | |
|---|---|
| National Treasury Employees Union | Julie M. Wilson<br>Paras N. Shah<br>Allison C. Giles<br>NATIONAL TREASURY EMPLOYEES UNION<br>800 K St., N.W., Suite 1000<br>Washington, DC 20001 |
| Current and Former Members of Congress | Hyland Hunt<br>Ruthanne M. Deutsch<br>DEUTSCH HUNT PLLC<br>300 New Jersey Ave. NW, Suite 900<br>Washington, DC 20001 |
| Farm Action, HEAL Food Alliance, Institute for Agriculture and Trade Policy, Rural Coalition, Partners for Rural Transformation | Rachel L. Fried<br>Jeffrey B. Dubner<br>Orlando Economos<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043 |
| The Mortgage Bankers Association, The National Association of Home Builders, and The National Association of Realtors® | Robert M. Loeb<br>Jeffrey P. Naimon<br>Lauren A. Weber<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>1152 15th Street, NW<br>Washington, DC 20005 |
| 90 State and Local Nonprofit Organizations | Seth E. Mermin<br>David S. Nahmias<br>Ayesha K. Rasheed<br>CENTER FOR CONSUMER LAW & ECONOMIC JUSTICE,<br>UC BERKELEY SCHOOL OF LAW<br>308 Law Building<br>Berkeley, CA 94720-7200 |

| | |
|---|---|
| AARP and AARP Foundation | Maame Gyamfi<br>William Alvarado Rivera<br>Dean Graybill<br>Julie Nepveu<br>AARP FOUNDATION<br>601 E Street, N.W.<br>Washington, DC 20004 |
| Ten Consumer Advocacy Organizations | Scott L. Nelson<br>Allison M. Zieve<br>PUBLIC CITIZEN LITIGATION GROUP<br>1600 20th Street NW<br>Washington, DC  20009 |
| Financial Regulation Scholars | Gregory M. Lipper<br>Rebecca S. Legrand<br>LEGRAND LAW PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br><br>Adam J. Levitin<br>GEORGETOWN UNIVERSITY LAW CENTER<br>600 New Jersey Avenue NW<br>Washington, DC 20001<br><br>Patricia A. McCoy<br>BOSTON COLLEGE LAW SCHOOL<br>885 Centre Street<br>Newton Centre, MA 02459 |
| Center for Constitutional Jurisprudence | John C. Eastman<br>Anthony T. Caso<br>CONSTITUTIONAL COUNSEL GROUP<br>174 W. Lincoln Ave. #620<br>Anaheim, CA 92805 |
| Atlantic Legal Foundation | Lawrence S. Ebner<br>ATLANTIC LEGAL FOUNDATION<br>1701 Pennsylvania Ave NW, |

|  | Suite 200<br>Washington, DC 20006 |
|---|---|
|  | Herbert L. Fenster<br>3800 Fox Ridge<br>Longmont, CO 80503 |
| Americans for Prosperity<br>Foundation | Michael Pepson<br>AMERICANS FOR PROSPERITY<br>FOUNDATION<br>1310 N. Courthouse Road, Ste. 700<br>Arlington, VA 22201 |
| Landmark Legal Foundation | Matthew C. Forys<br>Michael J. O'Neill<br>LANDMARK LEGAL FOUNDATION<br>19415 Deerfield Ave., Suite 312<br>Leesburg, VA 20176 |
|  | Richard P. Hutchison<br>LANDMARK LEGAL FOUNDATION<br>3100 Broadway, Suite 1210<br>Kansas City, MO 64111 |
| Former Members of Congress | Helgi C. Walker<br>Lucas C. Townsend<br>Russell Balikian<br>Lochlan F. Shelfer<br>Nathaniel J. Tisa<br>Hadhy H. Ayaz<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036 |
| Credit Union National Association,<br>Inc., National Association of<br>Federally-Insured Credit Unions,<br>and American Association of<br>Credit Union Leagues | Julian R. Ellis, Jr.<br>Robert P. Bacaj<br>BROWNSTEIN HYATT FARBER<br>SCHRECK, LLP<br>675 15th Street, Suite 2900<br>Denver, CO  80202 |

|  | Leah C. Dempsey |
|  | BROWNSTEIN HYATT FARBER SCHRECK, LLP |
|  | 1155 F Street N.W. |
|  | Washington, DC  20004 |
| New England Legal Foundation | Mark A. Perry |
|  | Joshua M. Wesneski |
|  | WEIL, GOTSHAL & MANGES LLP |
|  | 2001 M Street NW |
|  | Washington, DC  20036 |

New England Legal Foundation

Leah C. Dempsey
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
1155 F Street N.W.
Washington, DC  20004

Mark A. Perry
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC  20036

Mark I. Pinkert
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave.
Miami, FL  33131

Daniel B. Winslow
NEW ENGLAND LEGAL
FOUNDATION
333 Washington Street, Suite 850
Boston, MA  02108

ACA International

Christopher O. Murray
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO  80202

The New Civil Liberties Alliance,
The Buckeye Institute, The
Manhattan Institute for Policy
Research, and Law Offices of
Crystal Moroney, P.C.

Richard A. Samp
Margaret A. Little
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC  20036

Third Party Payment Processors
Association

Misha Tseytlin
Kevin M. LeRoy

TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 West Monroe
Suite 3900
Chicago, IL 60606

Keith Jerrod Barnett
Elizabeth P. Waldbeser
TROUTMAN PEPPER HAMILTON
SANDERS LLP
600 Peachtreet St., N.E. Suite 3000
Atlanta, GA 30308

132 Members of Congress

Jennifer L. Mascott
R. Trent McCotter
SEPARATION OF POWERS CLINIC,
GRAY CENTER FOR THE STUDY OF
THE ADMINISTRATIVE STATE,
ANTONIN SCALIA LAW SCHOOL
3301 Fairfax Dr.
Arlington, VA  22201

Chamber of Commerce of the
United States of America et al.

Cameron Thomas Norris
David L. Rosenthal
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste 700
Arlington, VA 22209

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC  20062

John Michael "Mick" Mulvaney

Brunn Wall Roysden III
FUSION LAW, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020

|  | Eric Blankenstein<br>LAW OFFICES OF ERIC<br>BLANKENSTEIN PLLC<br>1701 Pennsylvania Ave., NW, #200<br>Washington, DC  20006 |
|---|---|
| The Foundation for Government Accountability | Stewart Lee Whitson<br>David Craig<br>Sofia DeVito<br>Caroline M. B. Miller<br>Ryan Young<br>FOUNDATION FOR GOVERNMENT ACCOUNTABILITY<br>15275 Collier Blvd<br>Naples, FL 34119 |
| America's Future, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund | William Jeffrey Olson<br>Jeremiah L. Morgan<br>WILLIAM J. OLSON, P.C.<br>370 Maple Ave. W., Suite 4<br>Vienna, VA 22180<br><br>Rick Boyer<br>INTEGRITY LAW FIRM<br>P.O. Box 10953<br>Lynchburg, VA  24506 |
| Washington Legal Foundation | John M. Masslon II<br>Cory L. Andrews<br>WASHINGTON LEGAL FOUNDATION<br>2009 Massachusetts Ave. NW<br>Washington, DC  20036 |
| **Cross-Petitioners (No. 22-663)**<br>Community Financial Services Association of America, Limited, et al. | **Counsel**<br>Noel J. Francisco<br>Christian G. Vergonis<br>Hashim M. Mooppan<br>Yaakov M. Roth<br>Brinton Lucas<br>JONES DAY |

51 Louisiana Ave., N.W.
Washington, DC  20001

| | |
|---|---|
| *Amicus Curiae* **(No. 22-663)**<br>Third Party Payment Processors Association | **Counsel**<br>Misha Tseytlin<br>Kevin M. LeRoy<br>TROUTMAN PEPPER HAMILTON SANDERS LLP<br>227 West Monroe<br>Suite 3900<br>Chicago, IL 60606<br><br>Keith J. Barnett<br>Elizabeth P. Waldbeser<br>TROUTMAN PEPPER HAMILTON SANDERS LLP<br>600 Peachtreet St., N.E. Suite 3000<br>Atlanta, GA 30308 |
| **Cross-Respondents (No. 22-663)**<br>Consumer Financial Protection Bureau, et al. | **Counsel**<br>Elizabeth B. Prelogar<br>UNITED STATES DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>Seth Frotman<br>Steven Y. Bressler<br>Kristin Bateman<br>Christopher Deal<br>Kevin E. Friedl<br>Justin M. Sandberg<br>Stephanie Garlock<br>CONSUMER FINANCIAL PROTECTION BUREAU<br>Washington, D.C. 20552 |

_/s/ Christian G. Vergonis_
Christian G. Vergonis
_Counsel for Plaintiffs-Appellants_

## RULE 35(b)(1) STATEMENT AND INTRODUCTION

Although the Supreme Court has held that the CFPB's funding scheme satisfies the Appropriations Clause, the Rule here remains tainted by an *undisputed* constitutional violation—the invalid statutory restriction on the President's power to remove the Bureau's head. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). That unconstitutional provision is what allowed Director Cordray to stay in office and promulgate the Rule ten months after President Trump's inauguration. The Rule is thus directly attributable to the invalid statute, which enabled Cordray to exercise the powers of the Director's office that he no longer lawfully possessed. Vacatur is the proper remedy in such circumstances, as *Collins v. Yellen*, 594 U.S. 220 (2021), made clear.

Despite acknowledging this constitutional defect, the Panel refused to provide a remedy. Op. 16-20. Instead, it demanded Appellants (the Lenders) offer evidence that, in a world where Cordray had been removable, President Trump's *hypothetical replacement* for him in 2017 would have acted differently with respect to the Rule. Op. 18-20. This counterfactual standard is at odds not only with *Collins* itself, but with the decisions of other circuits as well, which require only a "showing that the challenged action was taken by [an officer] whom the President wished to remove but could not because of the statute." *E.g.*, *CFPB v. CashCall, Inc.*, 35 F.4th 734, 743 (9th Cir. 2022).

The Panel's remedial holding thus makes this Court one of the least hospitable places for removal-restriction challenges—a jurisdiction where it is virtually impossible for private parties to seek judicial enforcement of structural constitutional principles. Indeed, the Panel's ruling has already caused both this Court and district courts alike to deny relief in other separation-of-powers cases.

That conflict with Supreme Court precedent, division within the circuits, and the exceptional importance of the remedial issue would alone be enough to justify *en banc* review, but the Panel committed another error warranting the full Court's attention. In rejecting the Lenders' argument that the Rule was arbitrary as applied to certain categories of payments that did not implicate the Bureau's ostensible concerns, the Panel ultimately relied on administrative efficiency, concluding that mandating carve-outs to the Rule would be too "'complex[]'" and "'impracticable.'" Op. 14-15. But as this Court, the Supreme Court, and the D.C. Circuit have made clear, "'efficiency' is no substitute for 'reasoned decisionmaking'" under the Administrative Procedure Act (APA). *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1137 (5th Cir. 2021); *see also, e.g.*, *Judulang v. Holder*, 565 U.S. 42, 64 (2011); *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999). The Panel's reliance on administrative efficiency to justify the Rule's arbitrary application therefore creates both an *intra-* and *inter-* circuit conflict, providing yet another reason to grant *en banc* review.

# TABLE OF CONTENTS

**Page**

RULE 35(b)(1) STATEMENT AND INTRODUCTION .......................... xx

STATEMENT OF ISSUES MERITING REHEARING *EN BANC* ............. 1

STATEMENT OF FACTS AND PROCEEDINGS .................................... 1

ARGUMENT ....................................................................................... 3

I.   THE PANEL'S REMEDIAL INQUIRY FOR SEPARATION-OF-POWERS VIOLATIONS WARRANTS *EN BANC* REVIEW.............. 3

II.  THE PANEL'S USE OF AGENCY CONVENIENCE TO UPHOLD AN OVERBROAD RULE WARRANTS *EN BANC* REVIEW ........................................................................................ 13

CONCLUSION.................................................................................... 16

CERTIFICATE OF COMPLIANCE ....................................................... 17

CERTIFICATE OF SERVICE ............................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Arnesen v. Raimondo*,
Nos. 1:23-cv-145 & -160, 2024 WL 377820
(S.D. Miss. Jan. 31, 2024) ...................................................................... 12

*Axon Enter. v. FTC*,
598 U.S. 175 (2023) ................................................................................. 8

*Calumet Shreveport Ref., LLC v. EPA*,
86 F.4th 1121 (5th Cir. 2023) ................................................................ 13

*CFPB v. CashCall, Inc.*,
35 F.4th 734 (9th Cir. 2022) ............................................................xx, 10

*CFPB v. CFSA*,
601 U.S. 416 (2024) ............................................................................ 1, 3

*CFPB v. Nat'l Collegiate Master Student Loan Tr.*,
96 F.4th 599 (3d Cir. 2024) ................................................................... 11

*CFSA v. CFPB*,
143 S. Ct. 981 (2023) ............................................................................... 8

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004) ............................................................................... 11

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................. 6

*Cochran v. SEC*,
20 F.4th 194 (5th Cir. 2021) (en banc) ...............................................8, 11

*Collins v. Dep't of the Treasury*,
83 F.4th 970 (5th Cir. 2023) .................................................................. 12

*Collins v. Yellen*,
  594 U.S. 220 (2021) ............................................................*passim*

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ................................................................ 13

*Integrity Advance, LLC v. CFPB*,
  48 F.4th 1161 (10th Cir. 2022) ............................................... 10

*Judulang v. Holder*,
  565 U.S. 42 (2011) ..........................................................xxi, 14

*Kaufmann v. Kijakazi*,
  32 F.4th 843 (9th Cir. 2022) .................................................. 10

*Leachco, Inc. v. CPSC*,
  103 F.4th 748 (10th Cir. 2024) ............................................... 10

*Lucia v. SEC*,
  585 U.S. 237 (2018) ......................................................9, 10, 12

*Nat'l Mining Ass'n v. Babbitt*,
  172 F.3d 906 (D.C. Cir. 1999) ..........................................xxi, 15

*Paypal, Inc. v. CFPB*,
  No. 19-cv-3700, 2024 WL 1344791 (D.D.C. Mar. 29, 2024) ................... 15

*Petroleum Commc'ns, Inc. v. FCC*,
  22 F.3d 1164 (D.C. Cir. 1994) ............................................... 14

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018) (en banc) ..................................... 5

*Ryder v. United States*,
  515 U.S. 177 (1995) .............................................................. 12

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ......................................................... xx, 1

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) ..........................................................xxi, 14

**OTHER AUTHORITIES**

12 C.F.R. § 1041.7 ................................................................................. 2

12 C.F.R. § 1041.8 ................................................................................. 2

5th Cir. I.O.P. 35.6 .............................................................................. 16

82 Fed. Reg. 54472 (Nov. 17, 2017) ................................................2, 14

R. Cordray, *Watchdog: How Protecting Consumers Can Save Our*
*Families, Our Economy, and Our Democracy* (2020) ........................ 5

Fed. R. Civ. P. 56 ................................................................................. 6

H.R. 3118, 114th Cong. § 1 (2015) .................................................... 5

C. Skinner, *Presidential Pendulums in Finance*,
2020 COLUM. BUS. L. REV. 532 (2020) ........................................ 5

## STATEMENT OF ISSUES MERITING REHEARING *EN BANC*

**1.** Whether a party challenging governmental action taken by an individual who remained in office against the President's wishes due to an unconstitutional removal restriction must show that a hypothetical replacement officer would have taken a different action in order to obtain judicial relief.

**2.** Whether administrative efficiency is sufficient to justify the arbitrary application of an overbroad rule.

## STATEMENT OF FACTS AND PROCEEDINGS

In 2010, Congress created the CFPB and tasked it with "implementing and enforcing a large body of financial consumer protection laws." *Seila Law*, 591 U.S. at 206 (cleaned up). Despite "vesting the Bureau with sweeping authority," Congress took unprecedented steps to shield it "from the influence of the political branches." *CFPB v. CFSA*, 601 U.S. 416, 422 (2024). "To insulate the Bureau from the President's control, Congress put a single Director with a 5-year term at the Bureau's helm and made the Director removable only for inefficiency, neglect, or malfeasance"—a removal restriction later held unconstitutional in *Seila Law. Id.* The 2010 Congress also shielded the CFPB from future Congresses by giving it "a standing source of funding outside the ordinary annual appropriations process." *Id.*

In 2016, Director Cordray, President Obama's Senate-confirmed CFPB head, proposed a restriction on payday loans and other short-term, small-dollar consumer loans offered by non-bank lenders. Op 4. In 2017, after the change in administrations, but before *Seila Law* held that the Director's removal protection was unconstitutional, Cordray issued the Final Rule. 82 Fed. Reg. 54472 (Nov. 17, 2017). As relevant here, the Rule's payment provisions prohibit covered lenders from continuing to make preauthorized attempts to withdraw loan repayments from a consumer's bank account after two consecutive attempts have failed due to insufficient funds (absent renewed consumer authorization). 12 C.F.R. §§ 1041.7-1041.8.

In 2018, the Lenders filed a lawsuit seeking vacatur of the Rule on statutory and constitutional grounds. Op. 5. The district court rejected their arguments and granted summary judgment to the Bureau. Op. 6. The Panel affirmed some of those holdings. Op. 39. For example, it held that although the Rule had been "promulgated by a director who was unconstitutionally shielded from removal," the Lenders could not "obtain a remedy" under *Collins*. Op. 16-20. It also ruled that the payment provisions were "not arbitrary" as applied to "debit and prepaid card payments" or "separate installments of multi-payment installment loans." Op. 14-16. The Panel vacated the Rule, however, as "the product of the Bureau's unconstitutional funding scheme." Op. 39.

The Supreme Court reversed and remanded, holding that the Bureau's funding statute does not violate the Appropriations Clause. *CFSA*, 601 U.S. at 441. On remand, the Panel reinstated the remainder of its opinion, affirmed the grant of summary judgment to the CFPB, and allowed the Lenders 14 days to file a rehearing petition. 6/19/24 Op.

## ARGUMENT

*En banc* review is warranted for two reasons. *First*, the Panel's counterfactual remedial inquiry for separation-of-powers violations conflicts with decisions of both the Supreme Court and other circuits. *Second*, the Panel's reliance on administrative efficiency to justify the arbitrary application of an overbroad rule is at odds with the decisions of the Supreme Court, this Court, and the D.C. Circuit. Left uncorrected, each error threatens to impede judicial review of unlawful agency action.

## I.    THE PANEL'S REMEDIAL INQUIRY FOR SEPARATION-OF-POWERS VIOLATIONS WARRANTS *EN BANC* REVIEW.

Despite agreeing that the Rule was "promulgated by a director who was unconstitutionally shielded from removal," the Panel refused to vacate it absent proof that his hypothetical replacement "would have acted differently as to the rule." Op. 16, 20. That novel and untenable burden on separation-of-powers claimants cannot be squared with the Supreme Court's remedies jurisprudence or decisions of other circuits.

3

**A.**     In *Collins*, the Supreme Court addressed when a party is entitled to a remedy for agency action taken by an executive officer unconstitutionally shielded from removal. The key inquiry, the Court explained, is whether the removal restriction "inflict[ed] compensable harm," by actually thwarting the President's removal of the officer. 594 U.S. at 259-60. If the President would have removed the officer, then the officer's ability to take that action is attributable to the removal restriction, and the action should be vacated. *See id.*

Under that framework, the Lenders are entitled to vacatur. All agree that Director Cordray issued the Rule while unconstitutionally insulated from removal by President Trump. As the Panel recognized, the removal restriction was not held unenforceable until the Supreme Court decided *Seila Law* in 2020, and so the Rule's promulgation in 2017 occurred under the ostensible shield of removal protection. *See* Op. 4-6, 16.

The Rule's promulgation also occurred *because of* that protection. The Bureau has never genuinely disputed that President Trump would have fired Cordray—before the Rule's promulgation—absent the statutory impediment. Nor could it. Cordray himself provided a first-hand account of the relevant events: how "the threat that [he] would be fired as soon as President Trump took office loomed over everything"; how he was forced to "prepare a lawsuit to contest a firing"; and how his conversations with Gary Cohn, the senior White

House official "task[ed]" by the President with "deciding what to do" about removal, resulted in Cordray "negotiat[ing] a temporary truce" with the Trump administration "to await" the end of D.C. Circuit litigation addressing the removal restriction's constitutionality. R. Cordray, *Watchdog: How Protecting Consumers Can Save Our Families, Our Economy, and Our Democracy* 184-87 (2020).

Although the Panel suggested that Cordray's account—based on his direct interactions with the White House—was insufficient evidence of what President Trump would have done, Op. 19-20, the President made his own views crystal clear when, after Cordray's resignation, he appointed Acting Director Mulvaney, who had co-sponsored a bill to *abolish the CFPB*, H.R. 3118, 114th Cong. § 1 (2015), and who proceeded to "dramatically reduce[] the intensity of its enforcement actions," C. Skinner, *Presidential Pendulums in Finance*, 2020 COLUM. BUS. L. REV. 532, 552 (2020). And in response to the Lenders' evidentiary showing, the Bureau never identified a scintilla of evidence that would permit the district court to (im)plausibly find that President Trump *voluntarily* retained a controversial Obama-era holdover as the second "most powerful official in the entire U.S. Government." *PHH Corp. v. CFPB*, 881 F.3d 75, 171 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

Given the absence of any genuine dispute over whether President Trump would have removed Cordray but for the unconstitutional removal restriction,

the Lenders were entitled to summary judgment and vacatur under *Collins*. At the very least, they were entitled to an opportunity for discovery, as they had requested if necessary. *See* Fed. R. Civ. P. 56(d); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (permitting discovery in APA case where necessary for "effective judicial review"); Dist. Ct. Dkt. 91 at 7.

The Panel therefore could not properly have affirmed the district court's grant of summary judgment *to the Bureau* on the basis of President Trump's intentions. Indeed, if the Lenders' evidence is not enough to establish at least a genuine dispute of material fact as to President Trump's intentions, it is hard to see what would. Given all this, the Panel understandably did not purport to ground its remedial holding on the basis of what President Trump would have done. *See* Op. 19-20.

**B.**    Instead, the Panel ruled for the Bureau by engrafting another requirement onto the *Collins* inquiry. Specifically, the Panel thought that absent evidence that Cordray's hypothetical 2017 replacement "would have acted differently as to the rule," it could not grant vacatur because there would be no "nexus between the President's purported desire to remove Cordray and the promulgation of the … Rule." Op. 20. Although the Panel construed *Collins* to require such a showing, Op. 18-20, this "nexus" holding fundamentally misunderstands both *Collins* as well as other Supreme Court precedents.

*Collins* itself is unambiguous that a removal restriction "clearly" inflicts remediable harm if the President otherwise would have removed the officer who took the challenged agency action. 594 U.S. at 259-60. For example, such harm would be "clear-cut," the Court said, if "the President had attempted to remove [the officer] but was prevented from doing so by a lower court decision." *Id.* That example alone reveals that an impeded removal effort is sufficient to support a remedy; the Court did not say the challenger additionally had to establish that the unidentified, hypothetical replacement officer would have acted differently.

The Panel, however, overread *Collins*'s next example—that harm also would be "clear-cut" if the President had "express[ed] displeasure" with an officer's actions *and* "asserted that he would remove" the officer but for the statutory restriction. *Id.* at 260. The Panel read the conjunction in that example to mean that there must be "a nexus between the desire to remove and the challenged actions taken by the insulated actor." Op. 19. But the point of the second example was merely that the President's substantive disagreement with an insulated officer's actions can be *sufficient* evidence that the removal restriction caused harm, even absent a futile attempt to actually remove him. The Court obviously was not saying that such evidence is *necessary* even where it is already clear that the President would have removed the officer. That would contradict the first example, which, to repeat, did not require any such evidence.

Indeed, at least six Members of this Court have previously understood *Collins*'s second example to require only "a public statement that an officer would have been removed but for a removal protection." *Cochran v. SEC*, 20 F.4th 194, 232-33 (5th Cir. 2021) (en banc) (Oldham, J., joined by Smith, Willett, Duncan, Engelhardt, and Wilson, JJ., concurring) (*Cochran*), *aff'd sub nom. Axon Enter. v. FTC*, 598 U.S. 175 (2023).

In short, *Collins* is plainly satisfied where, as here, the party challenging the officer's action demonstrates (in any appropriate way) that the President would have removed the officer absent the invalid removal restriction. 594 U.S. at 259-60; *accord id.* at 279 (Gorsuch, J., concurring in part) (describing the majority as authorizing vacatur if "the President would have removed … the unconstitutionally insulated official had he known he had the authority to do so," and criticizing even that standard as imposing too high a burden). Indeed, that situation meets the Bureau's own articulation of the *Collins* inquiry—that a party "must show that the challenged action would not have been taken but for the unconstitutional removal restriction." Br. in Opp. 14, *CFSA v. CFPB*, 143 S. Ct. 981 (2023) (No. 22-663). Where, as here, the President otherwise would have fired the officer, "the challenged action" by definition "would not have been taken" *by that officer. Id.* It is irrelevant whether a *replacement officer* would have taken the same action, as the CFPB concedes for an officer improperly

shielded from removal by a "judicial order." *Id.* at 13. And to this day, the Bureau has never explained *why it matters* whether the President's removal plans are unconstitutionally thwarted by an erroneous court order applying the removal restriction or by the erroneous imprimatur of the restriction itself. President Trump left Cordray in office because of that unlawful legislative direction, which thus caused the same "effect" and inflicted the same "harm" as an unlawful judicial direction. *Collins*, 594 U.S. at 259.

Beyond *Collins*, the Panel's nexus requirement is at odds with the Supreme Court's Appointments Clause precedents. When an officer is improperly shielded from removal that otherwise would have occurred, his actions are akin to those of an improperly appointed officer. Both involve the "exercise of power that the actor did not lawfully possess," making vacatur the proper remedy. *Id.* at 258 (citing *Lucia v. SEC*, 585 U.S. 237, 251 (2018)). It is immaterial that the insulated officer *previously* lawfully held the powers of his office, because he *no longer does* once the President is unconstitutionally precluded from actually removing him. At that point, he becomes just as much a usurper in office as one who was unlawfully appointed in the first place.

The actions of usurpers are routinely set aside, without requiring any additional showing of whether a *different action* would have been taken had the proper appointment process been followed—even though that process often

would have led to the *same person* holding the office. *See, e.g.*, *Lucia*, 585 U.S. at 251. Once it is shown that the President otherwise would have removed an improperly insulated officer, there is no "difference" from an improperly appointed officer, for "[e]ither way, governmental action is taken by someone erroneously claiming the mantle of executive power—and thus taken with no authority at all." *Collins*, 594 U.S. at 276 (Gorsuch, J., concurring in part).

**C.**　　Apart from the break with Supreme Court precedent, the Panel's remedial inquiry is exceptionally important in its own right.

For one thing, it creates a circuit split. While the Panel held it is "not enough" to demonstrate "that the unconstitutional removal provision prevented the President from removing [an officer] he wished to replace," Op. 19, the Ninth Circuit has reached the opposite conclusion. In that jurisdiction, a party can obtain relief merely "by showing that the challenged action was taken by [an officer] whom the President wished to remove but could not because of the statute." *Cashcall*, 35 F.4th at 743; *see also Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (relief available "if the President would have removed the agency's head but for the provision"). The same is true in the Tenth Circuit, which has concluded that the *Collins* inquiry is satisfied if "the President would have removed" the officer "but for th[e] statutory protection." *Leachco, Inc. v. CPSC*, 103 F.4th 748, 757 n.8 (10th Cir. 2024); *accord Integrity Advance, LLC v.*

*CFPB*, 48 F.4th 1161, 1170 (10th Cir. 2022). And the Third Circuit has recognized that relief may be available if there is "'any link whatsoever between the removal provision and [c]laimant's case.'" *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 96 F.4th 599, 615 (3d Cir. 2024). In contrast to the Panel, those three circuits do not require challengers to also prove what the officer's hypothetical replacement would have done in his place.

For another, the Panel's counterfactual standard makes it all but impossible for private separation-of-powers claimants to obtain meaningful relief in this Circuit. Even on its own terms, *Collins* erects a "very challenging" standard for relief: Cases like this one, where it is clear "an officer would have been removed but for a removal protection," are "quite uncommon." *Cochran*, 20 F.4th at 232-33. The addition of a "nexus" requirement will reduce the universe of successful private challenges to a null set. There is no practical way for a private litigant to divine and prove both who a hypothetical, non-insulated replacement officer would have been and how he would have acted on the matter at issue—let alone without seeking intrusive discovery from the Executive Branch. *Cf. Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004) ("special considerations control" when the Executive Branch's interests in its "autonomy" and the "confidentiality of its communications are impacted").

Confirming the point, the Panel's remedial test has already led this Court to deny relief even when the President "had a substantiated desire to remove" an officer "and a perceived inability to do so because of [the] removal restriction." *Collins v. Dep't of the Treasury*, 83 F.4th 970, 983 (5th Cir. 2023) (cleaned up). And given the impossible demands of the "nexus" requirement, district courts have likewise spent little time on the remedy for such constitutional violations. *See, e.g.*, *Arnesen v. Raimondo*, Nos. 1:23-cv-145 & -160, 2024 WL 377820, at *26 (S.D. Miss. Jan. 31, 2024). With no realistic shot at obtaining relief, fewer litigants will bring separation-of-powers challenges in the first place, even though remedies in this area are supposed to "provide[] a suitable incentive to make such challenges." *Ryder v. United States*, 515 U.S. 177, 186 (1995); *accord Lucia*, 585 U.S. at 251 n.5. Especially given the critical role that structural constitutional principles play in securing individual liberty, the time to course-correct is now.

Indeed, it is particularly misguided to insist on the impossible in a conventional APA case like this one, involving a regulation that governs the challengers' primary conduct. *Collins*, in contrast, was a highly unusual case where private plaintiffs sought to collaterally attack an *intergovernmental agreement* implicating hundreds of billions of dollars that had already been distributed; and they did so even though the agreement itself had been adopted

by *properly removable* agency officials and at worst was "implemented" in some unspecified ways by an improperly insulated official. *See* 594 U.S. at 231-35, 257. That convoluted posture raised tricky remedial issues that the Supreme Court remanded for further consideration. *See id.* at 257-60. Here, no such circumstances warrant depriving the Lenders of the ordinary vacatur remedy. Judge-made remedial doctrines should not be distorted to deprive the Lenders of *any* judicial relief despite their concededly being injured by the actions of an executive officer who remained in office solely due to a removal restriction that the Supreme Court has *already held* is unconstitutional. Denying relief under such circumstances raises a far "more important question" than the remedial puzzles posed by the "unique context" of *Collins* itself. *Id.* at 282 (Gorsuch, J., concurring in part).

## II.  THE PANEL'S USE OF AGENCY CONVENIENCE TO UPHOLD AN OVERBROAD RULE WARRANTS *EN BANC* REVIEW.

At the same time it ratcheted up the standard for relief for APA challenges, the Panel ratcheted down the government's burden to defend against them on the merits. Because an agency must establish "a rational connection between the facts found and the choice made," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (cleaned up), even an arguably facially valid rule may be arbitrary "as applied" to situations unsupported by its rationale, *Calumet Shreveport Ref., LLC v. EPA*, 86 F.4th 1121, 1140 (5th Cir. 2023). That is the case here.

As the Lenders have explained, the application of the Rule's payment provisions to (1) debit- and prepaid-card payments and (2) separate installments of multi-payment installment loans does not serve those provisions' ostensible purpose. Opening Br. 49-57; Reply Br. 24-28. For example, unsuccessful withdrawal attempts against debit and prepaid cards ordinarily do not trigger the consumer fees the Rule supposedly targets. 82 Fed. Reg. at 54747, 54750. And multiple payment attempts for separate installments of a loan, being spaced two weeks or a month apart, by definition do not produce the asserted harm of "multiple attempts to collect payment on the same day" or "within a short period of time." *Id.* at 54723-24. By extending the Rule to these areas, the Bureau failed to account for facts that "warrant different treatment for different parties." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994).

Rather than grapple with this mismatch, the Panel ultimately deferred to the Bureau's assertion that including "carve out[s] for these transactions" would be "'impracticable'" or "'add considerable complexity.'" Op. 14-15. But "cheapness alone cannot save an arbitrary agency policy"; otherwise, "flipping coins would be a valid way to determine" the parties covered by a rule. *Judulang*, 565 U.S. at 64. This Court has therefore recognized that "'efficiency' is no substitute for 'reasoned decisionmaking.'" *Wages*, 16 F.4th at 1137. So has the D.C. Circuit, which has held an agency cannot defend an "irrationally

overbroad" regulation by asserting that the use of a blanket rule "is justified by efficiency." *Nat'l Mining Ass'n*, 172 F.3d at 913.

The Panel's decision conflicts with all this. In doing so, it invites the Bureau (and its ilk) to adopt indefensibly broad rules, safe in the knowledge that this Court is unlikely to pare back their arbitrary applications so long as the agency mouths concerns about efficiency. The Bureau is no stranger to such tactics, and the Panel's decision will only pour fuel on the fire. *See, e.g.*, *Paypal, Inc. v. CFPB*, No. 19-cv-3700, 2024 WL 1344791, at *3 (D.D.C. Mar. 29, 2024) (vacating arbitrary application of CFPB rule despite Bureau's assertion that "it was intentionally casting a wide net to avoid a patchwork regime") (cleaned up). Now that the Supreme Court has upheld the Bureau's funding scheme, it is more important than ever that the CFPB be held to the basic demands of reasoned decisionmaking.

## CONCLUSION

The Court should grant rehearing *en banc.*[*]

July 3, 2024                                     Respectfully submitted,

                                                */s/ Christian G. Vergonis*
                                                Christian G. Vergonis
                                                Brinton Lucas
                                                JONES DAY
                                                51 Louisiana Ave., N.W.
                                                Washington, DC 20001
                                                (202) 879-3939
                                                cvergonis@jonesday.com

        *Counsel for Plaintiffs-Appellants*

---

[*] Alternatively, the Panel remains free to correct its own errors by treating this filing as a petition for panel rehearing. *See* 5th Cir. I.O.P. 35.6.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) and Fifth Circuit Rule 35.5 because it contains 3,857 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Calisto MT style, 14-point font.

July 3, 2024　　　　　　　　　　　　　　　 */s/ Christian G. Vergonis*
　　　　　　　　　　　　　　　　　　　　　 Christian G. Vergonis

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I electronically filed the original of the foregoing brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ *Christian G. Vergonis*
Christian G. Vergonis

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 19, 2022

Lyle W. Cayce
Clerk

No. 21-50826

---

Community Financial Services Association of America, Limited; Consumer Service Alliance of Texas,

*Plaintiffs—Appellants,*

*versus*

Consumer Financial Protection Bureau; Rohit Chopra, *in his official capacity as Director, Consumer Financial Protection Bureau,*

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CV-295

---

Before Willett, Engelhardt, and Wilson, *Circuit Judges.*

Cory T. Wilson, *Circuit Judge*:

"An elective despotism was not the government we fought for; but one which should not only be founded on free principles, but in which the powers of government should be so divided and balanced . . . , as that no one could transcend their legal limits, without being effectually checked and restrained by the others." The Federalist No. 48 (J. Madison) (quoting Thomas Jefferson's *Notes on the State of Virginia* (1781)). In particular, as George Mason put it in Philadelphia in 1787, "[t]he purse & the

sword ought never to get into the same hands." 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 139–40 (M. Farrand ed. 1937). These foundational precepts of the American system of government animate the Plaintiffs' claims in this action. They also compel our decision today.

Community Financial Services Association of America and Consumer Service Alliance of Texas (the "Plaintiffs") challenge the validity of the Consumer Financial Protection Bureau's 2017 Payday Lending Rule. The Plaintiffs contend that in promulgating that rule, the Bureau acted arbitrarily and capriciously and exceeded its statutory authority. They also contend that the Bureau is unconstitutionally structured, challenging the Bureau Director's insulation from removal, Congress's broad delegation of authority to the Bureau, and the Bureau's unique, double-insulated funding mechanism. The district court rejected these arguments.

We agree that, for the most part, the Plaintiffs' claims miss their mark. But one arrow has found its target: Congress's decision to abdicate its appropriations power under the Constitution, i.e., to cede its power of the purse to the Bureau, violates the Constitution's structural separation of powers. We thus reverse the judgment of the district court, render judgment in favor of the Plaintiffs, and vacate the Bureau's 2017 Payday Lending Rule.

## I.

## A.

In response to the 2008 financial crisis, Congress enacted the Consumer Financial Protection Act, 12 U.S.C. §§ 5481–5603. The Act created the Bureau as an independent regulatory agency housed within the Federal Reserve System. *See id.* § 5491(a). The Bureau is charged with "implement[ing]" and "enforce[ing]" consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial

products and services" that "are fair, transparent, and competitive." *Id.*
§ 5511(a).

Congress transferred to the Bureau administrative and enforcement
authority over 18 federal statutes which prior to the Act were overseen by
seven different agencies. *See id.* §§ 5512(a), 5481(12), (14). Those statutes
"cover everything from credit cards and car payments to mortgages and
student loans." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020). In
addition, Congress enacted a sweeping new proscription on "any unfair,
deceptive, or abusive act or practice" by certain participants in the
consumer-finance industry. 12 U.S.C. § 5536(a)(1)(B). "Congress
authorized the [Bureau] to implement that broad standard (and the 18 pre-
existing statutes placed under the agency's purview) through binding
regulations." *Seila Law*, 140 S. Ct. at 2193 (citing 12 U.S.C. §§ 5531(a)–(b),
5581(a)(1)(A), (b)).

Congress placed the Bureau's leadership under a single Director to be
appointed by the President with the advice and consent of the Senate. 12
U.S.C. § 5491(b)(1)–(2). The Director serves a term of five years, with the
potential of a holdover period pending confirmation of a successor. *Id.*
§ 5491(c)(1)–(2). The Act originally limited the President's ability to remove
the Director, *id.* § 5491(c)(3), but the Supreme Court invalidated that
provision while this litigation was pending, *see Seila Law*, 140 S. Ct. at 2197.

The Director is vested with authority to "prescribe rules and issue
orders and guidance, as may be necessary or appropriate to enable the Bureau
to administer and carry out the purposes and objectives of the Federal
consumer financial laws, and to prevent evasions thereof." 12 U.S.C.
§ 5512(b)(1). This includes rules "identifying as unlawful unfair, deceptive,
or abusive acts or practices" committed by certain participants in the
consumer-finance industry. *Id.* § 5531(b).

The Bureau's funding scheme is unique across the myriad independent executive agencies across the federal government. It is not funded with periodic congressional appropriations. "Instead, the [Bureau] receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments." *Seila Law*, 140 S. Ct. at 2194. Each year, the Bureau simply requests an amount "determined by the Director to be reasonably necessary to carry out the" agency's functions. *Id.* § 5497(a)(1). The Federal Reserve must then transfer that amount so long as it does not exceed 12% of the Federal Reserve's "total operating expenses." *Id.* § 5497(a)(1)–(2). For the first five years of its existence (i.e., 2010–2014), the Bureau was permitted to exceed the 12% cap by $200 million annually so long as it reported the anticipated excess to the President and congressional appropriations committees. *Id.* § 5497(e)(1)–(2).

## B.

In 2016, Director Richard Cordray, who was appointed by President Barack Obama, proposed a rule to regulate payday, vehicle title, and certain high-cost installment loans (the "Payday Lending Rule"). After a public notice-and-comment period, Director Corday finalized the Payday Lending Rule in November 2017, during the first year of the Trump administration. *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472 (Nov. 17, 2017). The rule became effective on January 16, 2018, and had a compliance date of August 19, 2019. *Id.*

The Rule had two major components, each limiting a practice the Bureau deemed "unfair" and "abusive." *See id.* First, the "Underwriting Provisions" prohibited lenders from making covered loans "without reasonably determining that consumers have the ability to repay the loans according to their terms." 12 C.F.R. § 1041.4 (2018); 82 Fed. Reg. at 54472.

The Underwriting Provisions have since been repealed and are not at issue in this appeal. *See* 85 Fed. Reg. 44382 (July 22, 2019).

Second, and relevant here, the "Payment Provisions" limit a lender's ability to obtain loan repayments via preauthorized account access. *See* 12 C.F.R. § 1041.8. The Bureau determined that absent a new and specific authorization, it is "unfair and abusive" for lenders to attempt to withdraw payments for covered loans from consumers' accounts after two consecutive withdrawal attempts have failed due to a lack of sufficient funds. *Id*. § 1041.7; 82 Fed. Reg. at 54472. The Payment Provisions accordingly prohibit lenders from initiating additional payment transfers from consumers' accounts after two consecutive attempts have failed for insufficient funds unless "the additional payment transfers are authorized by the consumer." 12 C.F.R. § 1041.8(b)(1), (c)(1).

The Payment Provisions cast a wide net. So long as the purpose of the attempted transfer is to collect payment due on a covered loan, the two-attempt limit applies to "any lender-initiated debt or withdrawal of funds from a consumer's account." *Id*. § 1041.8(a)(1). This includes checks, debit and prepaid card transfers, preauthorized electronic fund transfers, and remotely created payment orders. *See id*.; 82 Fed. Reg. at 54910.

In April 2018, the Plaintiffs sued the Bureau on behalf of payday lenders and credit access businesses, seeking an "order and judgment holding unlawful, enjoining, and setting aside" the Payday Lending Rule. The Plaintiffs alleged that the rule exceeded the Bureau's statutory authority and otherwise violated the Administrative Procedure Act (APA). They further alleged that the rule was invalid because the Act's for-cause removal provision, self-funding mechanism, and delegation of rulemaking authority each violated the Constitution's separation of powers.

Around this time, the Bureau, now led by Acting Director Mick Mulvaney, announced that it intended to engage in notice-and-comment rulemaking to reconsider the Payday Lending Rule. Due to that ongoing effort, the parties filed a joint request to stay both the litigation and the rule's effective date. The district court entered a stay pending further order of the court. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 2018 WL 6252409, at *2 (W.D. Tex. Nov. 6, 2018).

While the Bureau engaged in rulemaking, President Trump nominated and the Senate confirmed Kathleen Kraninger as Director, replacing Acting Director Mulvaney. In early 2019, the Bureau issued a proposed rule rescinding the Underwriting Provisions but leaving the Payment Provisions intact. 84 Fed. Reg. 4252. In July 2020, following the Supreme Court's decision in *Seila Law*, the Bureau finalized its revised rule. 85 Fed. Reg. 44382. The Bureau simultaneously issued a separate "Ratification," in which it "affirm[ed] and ratifie[d] the [P]ayment [P]rovisions of the 2017 [Payday Lending] Rule." 85 Fed. Reg. 41905-02.

In August 2020, the district court lifted the stay, and the Plaintiffs amended their complaint to challenge, among other things, the Bureau's ratification of the Payment Provisions. Thereafter, the parties filed cross-motions for summary judgment. The district court granted summary judgment for the Bureau on each of the Plaintiffs' claims. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 558 F. Supp. 3d 350 (W.D. Tex. 2021). The court concluded, *inter alia*, that: (1) the promulgating Director's insulation from removal did not render the Payment Provisions void ab initio, *id.* at 358; (2) the Bureau's "ratification of the Payment Provisions was a solution tailored to the constitutional injury sustained by the [Plaintiffs]," *id.* at 365; (3) the "Payment Provisions [were] consistent with the Bureau's statutory authority and not arbitrary and capricious," *id.*; (4) the Bureau's self-funding mechanism did not violate the Appropriations Clause because it was

expressly authorized by statute, *id.* at 367; and (5) there was no nondelegation issue because the Bureau was vested with an "intelligible principle" to guide its discretion, *id.*

The Plaintiffs now appeal. We allowed the Third-Party Payment Processors Association, a national non-profit association of payment processors and their banks, to appear as amicus curiae in support of the Plaintiffs' arbitrary-and-capricious challenge.

## II.

We "review a district court's judgment on cross motions for summary judgment de novo, addressing each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Constitutional issues are also reviewed de novo. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

The Plaintiffs raise four overarching issues on appeal. They contend that the Payment Provisions of the Payday Lending Rule are invalid because: (1) the rule's promulgation violated the APA; (2) the rule was promulgated by a Director unconstitutionally insulated from presidential removal; (3) the Bureau's rulemaking authority violates the nondelegation doctrine; and (4) the Bureau's funding mechanism violates the Appropriations Clause of the Constitution. We address each argument in turn.

## A.

The APA instructs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). The Plaintiffs lodge two arguments under the APA. First, they contend that the Bureau exceeded its statutory authority by declaring more than two successive preauthorized withdrawals to be "unfair" and "abusive." Second, they assert that the Payment Provisions are arbitrary and capricious in their entirety or, alternatively, as applied to two specific contexts—installment loans and debit and prepaid card payments.

**1.**

The Act grants the Bureau broad authority to prescribe rules prohibiting "unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(b). This authority is not without limitation, however. Congress included specific definitions that govern when an act or practice may be deemed "unfair," *id.* § 5531(c)(1), or "abusive," *id.* § 5531(d). And unless those definitions are met, the Bureau "shall have no authority" to regulate conduct on either ground. *See id.* § 5531(c)–(d).

In devising the Payment Provisions, the Bureau assessed the statutory definitions and determined that it was both "unfair" and "abusive" for lenders to attempt additional withdrawals from consumers' accounts after two consecutive attempts failed due to insufficient funds unless the lender acquired "new and specific authorization." 12 C.F.R. § 1041.7; *see also* 82 Fed. Reg. at 54472. The Plaintiffs assert that the Bureau lacked authority to regulate the number of unsuccessful withdrawal attempts because this practice falls outside the Act's definitions of "unfair" and "abusive."

Our review begins (and ends) with unfairness.[1]  Under the Act, an act or practice is "unfair" if "the Bureau has a reasonable basis to conclude that [1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by the countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1).  The Bureau evaluated each element in its 2017 rulemaking record and concluded that the proscribed practice satisfied all three.  The Plaintiffs challenge only the first two elements on appeal.

As to the first, the Bureau determined that lenders' excessive withdrawal attempts cause or are likely to cause consumers substantial injury in the form of repeated fees, including insufficient fund fees, overdraft fees, and lender-imposed return fees.  82 Fed. Reg. at 54732–34.  It also found that "consumers who experience two or more consecutive failed lender payment attempts appear to be at greater risk of having their accounts closed by their account-holding institution."  *Id.* at 54734.  The Plaintiffs do not dispute the occurrence or substantiality of these injuries.  Rather, they challenge the Bureau's finding that the proscribed practice either causes or is likely to cause them.  The Plaintiffs assert that "[c]onsumers' banks—not lenders—cause failed-payment fees or bank-account closures" because they are the ones who "impose, collect, or otherwise control [them]."

We are unpersuaded.  The presence of an "independent causal agent[]" does not "erase the role" lenders play in bringing about the contemplated harm.  *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010).

---

[1] Because we ultimately conclude that the Bureau acted within its statutory authority in deeming the proscribed practice unfair, we do not address the alternative ground of abusiveness.  *See* 12 U.S.C. § 5531(b) (authorizing the Bureau to prescribe rules regulating practices that are "unfair," "abusive," or both).

Though not the "most proximate cause," a lender's repeated initiation of unsuccessful payment transfers is both a but-for and a proximate cause of any resulting fees or closures. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015) ("[The fact] that a company's conduct was not *the most* proximate cause of an injury generally does not immunize liability from foreseeable harms.").

The Plaintiffs also challenge the Bureau's finding that these injuries are not reasonably avoidable by consumers. Few courts have meaningfully addressed this second element of "unfairness" under the Act. *E.g.*, *CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *20–21 (M.D. Pa. Aug. 4, 2017); *CFPB v. D & D Mktg.*, No. CV 15-9692, 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 916–17 (S.D. Ind. 2015). In doing so, these courts relied on our sister circuits' interpretations of "reasonably avoidable" from the analogous standard in the Federal Trade Commission Act (FTCA). *See* 15 U.S.C. § 45(n).[2] We do the same.[3]

To determine whether an injury was "reasonably avoidable" under the FTCA, courts generally "look to whether the consumers had a free and informed choice." *Neovi*, 604 F.3d at 1158; *accord Am. Fin. Servs. Ass'n v.*

---

[2] Section 45(n) provides that the Federal Trade Commission "shall have no authority . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."

[3] Looking to the FTCA for guidance, we remain mindful of one important distinction: The Act requires only that the Bureau have "a *reasonable basis* to conclude that" the proscribed practice "is not reasonably avoidable by consumers," 12 U.S.C. § 5531(c)(1) (emphasis added), while the FTCA includes no such qualifier, *see* 15 U.S.C. § 45(n). In other words, while we find the standards to be analogous, the Bureau is perhaps afforded more deference in its determination than would be afforded under the FTCA.

*FTC*, 767 F.2d 957, 976 (D.C. Cir. 1985). "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012) (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365–66 (11th Cir. 1988)). The Plaintiffs contend that consumers can reasonably avoid injury associated with successive withdrawal attempts by (1) "not authorizing automatic withdrawals," (2) "sufficiently funding [their] account[s]," (3) "negotiating revised payment options," (4) "invoking [their] rights under federal law to issue stop-payment orders or rescind account access," or (5) "declining to take out the loan" and "pursuing alternative[] sources of credit."

Each of these concerns was raised during the public comment period of the Bureau's rulemaking process. *See, e.g.*, 82 Fed. Reg. at 54736–37. The Bureau found none of them sufficient to constitute a reasonable means of avoiding injury. *Id.* at 54737. The rulemaking record prefaces that many borrowers resort to payday loans because they are in financial distress and lack other viable options for financing. *Id.* at 54571, 54735. Addressing the Plaintiffs' first point, the Bureau explained that since "leveraged payment mechanisms" are "a central feature of these loans," borrowers typically do not have the ability to shop for loans without them. *Id.* at 54737. The Bureau also found that simply funding their accounts is not a reasonable means for borrowers to avoid injury because "[m]any borrowers [do] not have the funds" after two unsuccessful withdrawal attempts, and "subsequent [withdrawals] can occur very quickly, often on the same day, making it difficult to ensure funds are in the right account before the [next withdrawal] hits." *Id.* For the same reason, the Bureau found negotiating repayment

options to be too slow a solution to mitigate against fees incurred on additional withdrawal attempts. *See id.* at 54736–37.

Regarding the Plaintiffs' fourth point, the Bureau explained that costs, "[c]omplexities in payment processing systems[,] and the internal procedures of consumers' account-holding institutions, combined with lender practices, often make it difficult for consumers to stop payment or revoke authorization effectively." *Id.* Finally, the Bureau concluded that "the suggestion that a consumer can simply decide not to participate in the market is not . . . a valid means of reasonably avoiding the injury." *Id.* at 54737. By that logic, the Bureau reasoned, "no market practice could ever be determined to be unfair." *Id.*

The Bureau's explanations are fully fleshed out in the Payday Lending Rule's 519-page rulemaking record, where they are supported by a variety of data and industry-related studies. Reviewing that record as it undergirds the Payment Provisions, we find the Bureau had "a reasonable basis to conclude" that the harms associated with three or more unsuccessful withdrawal attempts are "not reasonably avoidable by consumers." 12 U.S.C. § 5531(c)(1). Because the proscribed practice thus satisfies the elements of an "unfair" practice under the Act, we conclude that the Bureau acted within its statutory authority in promulgating the Payment Provisions.

## 2.

Next, the Plaintiffs contend that the Payment Provisions are arbitrary and capricious, either as a whole or as applied. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Still, we must ensure that an agency "examine[s] the relevant data and articulate[s] a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). A rule is arbitrary and capricious if the agency relied on "impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *BCCA Appeal Grp. v. U.S. EPA*, 355 F.3d 817, 824 (5th Cir. 2003).

Here, the Plaintiffs first contend that the Payment Provisions are arbitrary and capricious in their entirety because they rest on stale data from four-to-five years prior to their promulgation, and the Bureau failed to consider the provisions' important countervailing effects. As to the first point, the Plaintiffs forfeited their stale data argument by failing to raise it in the district court. *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 398 (5th Cir. 2021). And forfeiture aside, the Bureau offered a reasoned explanation in its 2017 rulemaking record for relying on data collected from 2011–2012. *See* 82 Fed. Reg. at 54722, 54729.

As to the second point, the only countervailing effect the Plaintiffs allege the Bureau failed to consider is "the increased likelihood that a loan will enter into collections sooner than it would have (if it would have at all)." But the Bureau persuasively responds that "[i]f the borrower is unable to obtain the funds, it is unclear why the borrower (or the lender) would be better off if the lender could initiate failed withdrawal attempts—and, in the process, pile additional fees onto the borrower—before the loan enters collections." Even if the Payment Provisions' limit on repeated withdrawal attempts might send some loans to collections sooner, that possibility is not so "important" that the Bureau had to consider it specifically. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (explaining "an agency rule would be arbitrary

and capricious if the agency . . . entirely failed to consider an important aspect of the problem").

Turning to their as-applied challenge, the Plaintiffs assert that the Payment Provisions are arbitrary and capricious as applied to debit and prepaid card payments and as to separate installments of multi-payment installment loans. Amicus joins them with respect to debit and prepaid cards. Together, they contend that the Payment Provisions "arbitrarily treat[] debit and prepaid card payments the same as check and [account clearinghouse] payments, even though the former do not give rise to the fees that, in the Bureau's assessment, justify the Rule."

The Bureau acknowledged in the rulemaking record that debit and prepaid card transactions "present somewhat less risk of harm to consumers," but it declined to exclude them for several reasons. 82 Fed. Reg. at 54750. For one, the Bureau found that though failed debit and prepaid card transactions may not trigger insufficient fund fees, "some of them do trigger overdraft fees, even after two failed attempts." *Id.* And as with other payment-transfer methods, consumers would still be subject to "return payment fees and late fees charged by lenders." *Id.* at 54723, 54734. The Bureau also explained that a carve out for these transactions "would be impracticable to comply with and enforce." *Id.* at 54750. These considerations suffice to establish a "rational connection between the facts found and choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quotation omitted). Therefore, the Payment Provisions are not arbitrary and capricious as applied to debit and prepaid card transfers.[4]

---

[4] The Plaintiffs also contend that "the denial of [Advance Financial's] rulemaking petition seeking amendment of the [Payday Lending] Rule to exclude debit and prepaid card payments was arbitrary and capricious." But just as it was not arbitrary and capricious for the Bureau initially to include these payment types within the rule, it was not arbitrary

Similarly, we cannot say that the Bureau acted arbitrarily and capriciously by extending the Payment Provisions' two-attempt limit across all scheduled installment payments on the same loan. The Plaintiffs contend that the Bureau failed to support its decision with "reasoned analysis or record evidence." But again, the rulemaking record proves otherwise. Citing its own study, the Bureau explained that a third withdrawal attempt, even as applied to a different scheduled payment, would still likely fail "even if two weeks or a month has passed." 82 Fed. Reg. at 54753. The Bureau also found that "the tailoring of individualized requirements for each discrete payment practice would add considerable complexity to the rule." *Id.* Further, the Bureau determined that distinguishing between re-presentments of the same payment and new presentments for new installments would invite evasion by lenders. The Bureau referenced a rule imposed by the National Automated Clearinghouse Association (NACHA), a self-governing private organization, that is similar to the Payment Provisions (except that it only applies after three attempts). *See id.* at 54728–29. The Bureau noted that the NACHA rule's distinction between attempts to collect a new payment and re-initiation of a prior one had led companies to manipulate data fields so that it would appear as if a withdrawal attempt was for a new installment. *See id.* at 54728 n.985 & 54729.

In sum, we conclude that the Payment Provisions are not arbitrary and capricious, either in their entirety or in their two contested applications. As Plaintiffs fail to show that the Payday Lending Rule's promulgation violated

---

and capricious for the Bureau to deny a rulemaking petition asking for their exemption. This is especially true considering the "extremely limited and highly deferential" standard under which we review an agency's "[r]efusal[] to promulgate rules." *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007) (internal quotation marks omitted) (quoting *Nat'l Customs Brokers & Forwarders Ass'n. of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)).

the APA, summary judgment in favor of the Bureau on this claim was warranted.

## B.

The Plaintiffs next contend that the Payment Provisions must be invalidated because the Payday Lending Rule was initially promulgated by a director who was unconstitutionally shielded from removal.

### 1.

The Act states that the Bureau's Director may be removed only "for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). In *Seila Law*, the Court held that this limitation on the President's removal power violated the Constitution's separation of powers. 140 S. Ct. at 2197. But the Court declined to find that the Director's unconstitutional insulation from removal rendered the remainder of the Act invalid. *Id*. at 2208–11. Instead, the Court concluded that the infirm removal provision was severable and remanded the case for a determination of the appropriate relief. *Id*. at 2211.

Like *Seila Law*, *Collins v. Yellen*, 141 S. Ct. 1761 (2021), involved a challenge to actions taken by an independent agency, the Federal Housing Finance Agency (FHFA), that was headed by a single officer removable only for cause. *See* 141 S. Ct. at 1784. The *Collins* petitioners asserted that the FHFA Director's for-cause removal protection violated the separation of powers, and therefore the agency actions at issue "must be completely undone." *Id*. at 1787. The Court agreed that the for-cause removal provision was unconstitutional, finding *Seila Law* "all but dispositive." *Id*. at 1783. But it refused to hold that an officer's insulation from removal, by itself, rendered all agency action taken under that officer void. *Id*. at 1787–88. Unlike cases "involv[ing] a Government actor's exercise of power that the actor did not lawfully possess," the Court explained, a properly appointed officer's

insulation from removal "does not strip the [officer] of the power to undertake the other responsibilities of his office." *Id.* at 1788 & n.23. Thus, to obtain a remedy, the challenging party must demonstrate not only that the removal restriction violates the Constitution but also that "the unconstitutional removal provision inflicted harm." *Id.* at 1788–89.

While the Plaintiffs acknowledge *Collins*, they argue the case is distinguishable on several grounds. None are persuasive.

First, they assert that *Collins* applies only to retrospective relief. But *Collins* did not rest on a distinction between prospective and retrospective relief. As the Sixth Circuit recently explained, *Collins*'s remedial inquiry "focuse[d] on whether a 'harm' occurred that would create an entitlement to a remedy, rather than the nature of the remedy, and our determination as to whether an unconstitutional removal protection 'inflicted harm' remains the same whether the petitioner seeks retrospective or prospective relief." *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022).[5]

The Plaintiffs also contend that *Collins* "does not apply to rulemaking challenges." This distinction is similarly without a difference. To the contrary, in *Collins*, the Court explicitly stated that "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n.23. Because the Bureau's Director's "other responsibilities" include rulemaking, *see* 12 U.S.C. §§ 5511(a), 5512(b), *Collins* is directly on point, and the Plaintiffs

---

[5] *Collins* originally involved claims for both prospective and retrospective relief. 141 S. Ct. at 1780. By the time the case reached the Supreme Court, the challengers' claims for prospective relief were moot. *Id.* Therefore, the Court articulated its remedial analysis in terms of retrospective relief. *See id.* at 1788–89.

must demonstrate that the unconstitutional removal provision caused them harm.

**2.**

Joining the issue, the Plaintiffs assert that "even if *Collins* does inform the analysis here, its framework plainly requires setting aside the [Payment Provisions]" because the Plaintiffs have made a sufficient showing of harm. As noted above, after *Collins*, a party challenging agency action must show not only that the removal restriction transgresses the Constitution's separation of powers but also that the unconstitutional provision caused (or would cause) them harm. 141 S. Ct. at 1789. The Court chose to remand *Collins*'s remedy question and stopped short of articulating a precise statement as to how a party may prove harm. *See id.* at 1788–89. Instead, the *Collins* majority concluded with several hypotheticals:

> Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director . . . could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.*

We distill from these hypotheticals three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor. This is borne out by the concurring Justices' opinions as well. *See id.* at 1792–93 (Thomas, J., concurring); *id.* at 1801 (Kagan, J., concurring in part); *id.* at 1803 n.1 (Sotomayor, J., concurring in part and dissenting in part). As Justice Kagan emphasized, "plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head *affected the complained-of decision*." *Id.* at 1801 (Kagan, J., concurring in part) (emphasis added).

It is thus not enough, as the Plaintiffs would have us hold, for a challenger to obtain relief merely by establishing that the unconstitutional removal provision prevented the President from removing a Director he wished to replace. As we read *Collins*, to demonstrate harm, the Plaintiffs must show *a connection* between the President's frustrated desire to remove the actor and the agency action complained of. *See id.* at 1789. Without this showing, the Plaintiffs could put themselves in a better place than otherwise warranted, by challenging decisions either with which the President agreed, or of which he had no awareness at all. *Id.* at 1802 (Kagan, J., concurring in part).

Applying *Collins*'s framework, we conclude the Plaintiffs fail to show that the Act's removal provision inflicted a constitutional harm. Though they state "[i]t is uncontested that, but for the later-invalidated removal restriction, President Trump would have replaced [Director] Cordray before he finalized the [Payday Lending Rule]," their only support for this assertion consists of a few carefully selected statements from Director Cordray's book, *see, e.g.*, Richard Cordray, Watchdog: How Protecting

Consumers Can Save Our Families, Our Economy, and Our Democracy 185 (2020) ("[T]he threat that I would be fired as soon as President Trump took office loomed over everything."), and an online article, *see* Kate Berry, *In Tell-All, Ex-CFPB Chief Cordray Claims Trump Nearly Fired Him*, American Banker (Feb. 27, 2020) https://www.americanbanker.com/news/in-tell-all-ex-cfpb-chief-cordrayclaims-trump-nearly-fired-him (stating "President Trump was advised to hold off on firing Corday because the Supreme Court had not yet weighed in on [the] 'for cause' provision").

These secondhand accounts of President Trump's supposed intentions are insufficient to establish harm. The Director's subjective belief that his firing might be imminent does not in itself substantiate that the President would have removed the Director but for the unconstitutional removal provision. Regardless, the record before us plainly fails to demonstrate any nexus between the President's purported desire to remove Cordray and the promulgation of the Payday Lending Rule or, specifically, the Payment Provisions. In short, nothing the Plaintiffs proffer indicates that, but for the removal restriction, President Trump would have removed Cordray *and* that the Bureau would have acted differently as to the rule.

Because the Plaintiffs have failed to demonstrate harm, we need not address the Bureau's alternative argument that any alleged harm was cured by Director Kraninger's ratification of the Payment Provisions. *See CFPB v. CashCall, Inc.*, 35 F.4th 734, 743 (9th Cir. 2022) (finding "it unnecessary to consider ratification" where the challenger could not establish harm). Summary judgment in favor of the Bureau on this claim was proper.

## C.

We next consider the Plaintiffs' argument that the Bureau's rulemaking authority violates the Constitution's separation of powers by

running afoul of the nondelegation doctrine.[6] The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. Inherent in "that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion). "Under the nondelegation doctrine, Congress may not constitutionally delegate its legislative power to another branch of government." *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998) (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

But the Supreme Court has long delimited this general principle: "So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Touby v. United States*, 500 U.S. 160, 165 (1991) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see also Gundy*, 139 S. Ct. at 2129 (explaining that "[t]hose standards . . . are not demanding").

Through the Act, Congress gave the Bureau authority "to prescribe rules . . . identifying as unlawful unfair, deceptive, or abusive acts or practices." 12 U.S.C. § 5531(b). This constituted a delegation of legislative power because "the lawmaking function belongs to Congress." *Loving v. United States*, 517 U.S. 748, 758 (1996). The question is whether Congress

---

[6] For the first time on appeal, the Plaintiffs also argue that Congress violated the nondelegation doctrine by delegating its appropriations power to the Bureau. This argument is distinct from the Plaintiffs' Appropriations Clause challenge, which was raised in the district court and which we address *infra* in II.D. Because the Plaintiffs did not raise their appropriations-based nondelegation argument in the district court, it is forfeited on appeal. *See Rollins*, 8 F.4th at 398.

also "supplied an intelligible principle to guide the [Bureau's] discretion." *Gundy*, 139 S. Ct. at 2123.

The Plaintiffs assert that "[t]here is no intelligible principle" behind the Bureau's "vague and sweeping" rulemaking authority. We disagree. In the Act, Congress articulated its general policy preferences, established the Bureau as the agency to apply them, and set boundaries—albeit broad ones—on the Bureau's rulemaking authority. *Am. Power & Light Co.*, 329 U.S. at 105. Given that the Supreme Court "has over and over upheld even very broad delegations," *Gundy*, 139 S. Ct. at 2129, the Act's delegation of rulemaking authority to the Bureau passes muster.

Congress's general policy is distilled in the Bureau's purpose and objectives. 12 U.S.C. § 5511(a)–(b). The Bureau's "purpose" is "to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). That purpose is accompanied by five "objectives" toward which "[t]he Bureau is authorized to exercise its authorit[y.]" *Id.* § 5511(b). One of those is to "ensur[e] that . . . consumers are protected from unfair, deceptive, or abusive acts and practices." *Id.* § 5511(b)(2). In line with that objective, Congress empowered the Bureau to "prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(b). Congress then circumscribed that authority by

including specific criteria that must be met before the Bureau can label a practice "unfair" or "abusive." *See id.* § 5531(c)–(d).[7]

Far from an "open-ended delegation" that offers "no guidance whatsoever," *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022) (emphasis omitted), Congress's grant of rulemaking authority to the Bureau was accompanied by a specific purpose, objectives, and definitions to guide the Bureau's discretion. This was more than sufficient to confer an "intelligible principle." *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 474–75 (2001) (compiling the various directives the Supreme Court has deemed sufficient to constitute an "intelligible principle").

## D.

Finally, the Plaintiffs contend that the Payday Lending Rule is invalid because the Bureau's funding structure violates the Appropriations Clause of the Constitution and the separation of powers principles enshrined in it. Though the constitutionality of the Bureau has been heavily litigated, this issue has yet to be definitively resolved. In *Seila Law*, the Supreme Court determined that the Act's presidential removal restriction violated the Constitution's separation of powers, but the Court did not confront whether

---

[7] We discussed the statutory elements of "unfairness" *supra* in II.A.1. It was unnecessary to address "abusiveness" there. *See supra* n.1. For reference here, an act or practice is "abusive" if it

> (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; *or* (2) takes unreasonable advantage of—(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531(d).

the Bureau's unique funding scheme does. 140 S. Ct. at 2197. And a majority of this court recently concluded that the issue was not properly before us in another case challenging the Bureau's structure and authority. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 220 & n.2 (5th Cir. 2022) (en banc). However, Judge Jones, in a magisterial separate opinion joined by several of our colleagues, disagreed and addressed the parties' Appropriations Clause challenge. *See id.* at 221 (Jones, J., concurring). Methodically analyzing the question, she concluded that the Bureau's funding mechanism contravenes the Constitution's separation of powers. *Id.* at 242.

The issue is squarely raised here. We reach the same conclusion.

### 1.

Our "system of separated powers and checks and balances established in the Constitution was regarded by the Framers as 'a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" *Morrison v. Olson*, 487 U.S. 654, 693 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). "If there is one aspect of the doctrine of Separation of Powers that the Founding Fathers agreed upon, it is the principle, as Montesquieu stated it: 'To prevent the abuse of power, it is necessary that by the very disposition of things, power should be a check to power.'" *United States v. Cox*, 342 F.2d 167, 190 (5th Cir. 1965) (Wisdom, J., concurring) (quoting Baron de Montesquieu, The Spirit of the Laws bk. XI, ch. IV (1772)). On that foundation, the Framers erected the three branches of government—legislative, executive, and judicial—and endowed each with "the necessary constitutional means and personal motives to resist encroachments of the others." The Federalist No. 51 (J. Madison); *see* U.S. Const. art. I, § 1; *id.* art. II, § 1, cl. 1; *id.* art. III, § 1.

Drawing on the British experience, the Framers "carefully separate[d] the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021).[8]  The Framers' reasoning was twofold.  First, they viewed Congress's exclusive "power over the purse" as an indispensable check on "the overgrown prerogatives of the other branches of the government."  THE FEDERALIST NO. 58 (J. Madison).  Indeed, "the separation of purse and sword was the Federalists' strongest rejoinder to Anti-Federalist fears of a tyrannical president."  JOSH CHAFETZ, CONGRESS'S CONSTITUTION, LEGISLATIVE AUTHORITY AND THE SEPARATION OF POWERS 57 (2017).

The Framers also believed that vesting Congress with control over fiscal matters was the best means of ensuring transparency and accountability to the people.  *See* THE FEDERALIST NO. 48 (J. Madison) ("[T]he legislative department alone has access to the pockets of the people.").[9]  As

---

[8] As Alexander Hamilton explained, the powers of "the sword and the purse" should never be placed

> in either the Legislative or Executive, singly; neither one nor the other shall have both; because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny. But when the purse is lodged in one branch, and the sword in another, there can be no danger.

2 THE WORKS OF ALEXANDER HAMILTON 61 (Henry Cabot Lodge ed., 1904). George Mason expressed the same sentiment, advising his colleagues at the Philadelphia Convention that "[t]he purse & the sword ought never to get into the same hands." 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 139–40 (M. Farrand ed. 1937).

[9] *See also* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 149–50 (M. Farrand ed. 1937) (statement of James McHenry) ("When the Public Money is lodged in its Treasury there can be no regulation more consist[e]nt with the Spirit of Economy and free Government that it shall only be drawn forth under appropriation by Law and this part of the proposed Constitution could meet with no opposition as the People who give their Money ought to know in what manner it is expended.").

James Madison explained, the "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." THE FEDERALIST NO. 58 (J. Madison).[10]

The text of the Constitution reflects these foundational considerations. First, even before enumerating how legislation becomes law (i.e., passage by both houses of Congress and presentment to the President for signature), the Constitution provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives . . . ." U.S. CONST. art. I, § 7, cl. 1. It then grants the general authority "[t]o lay and collect Taxes" and spend public funds for various ends—the first power positively granted to Congress by the Constitution. *Id.* art. I, § 8, cl. 1. Importantly though, that general grant of spending power is cabined by the Appropriations Clause and its follow-on, the Public Accounts Clause: "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." *Id.* art. I, § 9, cl. 7.

---

[10] Indeed, popular accountability for the expenditure of public funds was so important that an earlier draft of the Constitution restricted the power to originate appropriations to the House of Representatives: "[A]ll Bills for raising or Appropriating Money, and for fixing the Salaries of the Officers of the Government of the United States shall originate in the first Branch of the Legislature of the United States, and shall not be altered or amended by the second Branch; and that no money shall be drawn from the public Treasury but in Pursuance of Appropriations to be originated by the first Branch." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 129–34 (M. Farrand ed. 1937). Although not carried forward in the Appropriations Clause as ratified, this procedure is well-established in Congressional custom, which requires general appropriations bills to originate in the House of Representatives. CLARENCE CANNON, CANNON'S PROCEDURE IN THE HOUSE OF REPRESENTATIVES 20, § 834 (4th ed. 1944).

The Appropriations Clause's "straightforward and explicit command" ensures Congress's *exclusive* power over the federal purse. *OPM v. Richmond*, 496 U.S. 414, 424 (1990). Critically, it makes clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425. Of equal importance is what the clause "takes away from Congress: the option *not* to require legislative appropriations prior to expenditure." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1349 (1988). Given that the executive is forbidden from unilaterally spending funds, the actual exercise by Congress of its power of the purse is imperative to a functional government. The Appropriations Clause thus does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority "to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *All Am. Check Cashing*, 33 F.4th at 231 (Jones, J., concurring).

The Appropriations Clause thus embodies the Framers' objectives of maintaining "the necessary partition among the several departments," The Federalist No. 51 (J. Madison), and ensuring transparency and accountability between the people and their government. The clause's role as "a bulwark of the Constitution's separation of powers" has been repeatedly affirmed. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.); *see id.* ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority.") (citations omitted); *see also, e.g.*, *Sierra Club v. Trump*, 929 F.3d 670, 704 (9th Cir. 2019) ("The Appropriations Clause is a vital instrument of separation of powers . . . ."); *City of Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) (discussing the power of the purse as an important aspect of the separation

of powers created by "[t]he founders of our country"); *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) ("The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them."). As Justice Story said:

> The object is apparent upon the slightest examination. It is to secure regularity, punctuality, and fidelity, in the disbursements of the public money . . . . If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure. The power to control and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation.

2 Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858). Justice Scalia similarly observed that, while the requirement that funds be disbursed in accord with Congress's dictate and Congress's alone may be inconvenient, "clumsy," or "inefficient," it "reflect[s] 'hard choices . . . consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked.'" *NLRB v. Noel Canning*, 573 U.S. 513, 601–02 (2014) (Scalia, J., concurring) (quoting *INS v. Chadha*, 462 U.S. 919, 959 (1983)). In short, the Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

## 2.

All that in mind, we turn to the Bureau's structure. The Bureau "wields vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law*, 140 S. Ct. at 2191. "The agency has the authority to conduct investigations, issue subpoenas

and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Id.* at 2193. The Bureau "may seek restitution, disgorgement, and injunctive relief, as well as civil penalties of up to $1,000,000 (inflation adjusted) for each day that a violation occurs." *Id.* Unlike nearly every other administrative agency, Congress placed this "staggering amalgam of legislative, judicial, and executive power in the hands of a single Director" rather than a multimember board or commission. *All Am. Check Cashing*, 33 F.4th at 221–22 (Jones, J., concurring); *see* 12 U.S.C. § 5491(b).

Most anomalous is the Bureau's self-actualizing, perpetual funding mechanism. While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not. *See* 12 U.S.C. § 5497(a). Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount "determined by the Director to be reasonably necessary to carry out" the Bureau's functions.[11] *Id.* The Federal Reserve must grant that request so long as it does not exceed 12% of the Federal Reserve's "total operating expenses." 12 U.S.C. § 5497(a)(1)–(2).[12] The funds siphoned by

---

[11] As noted, in addition to the funds it draws from the Federal Reserve, the Bureau is empowered to impose significant monetary penalties through administrative adjudications and civil actions. 12 U.S.C. § 5565(a)(2). Those penalties, when levied, are deposited into a "Civil Penalty Fund," expenditures from which are restricted "for payments to the victims of activities for which civil penalties have been imposed under the Federal consumer financial laws." *Id.* § 5497(d)(1)–(2). "To the extent that such victims cannot be located or such payments are otherwise not practicable, the Bureau may use such funds for the purpose of consumer education and financial literacy programs." *Id.* § 5497(d)(2). As Civil Penalty Fund balances cannot be used to defray the Bureau's general expenses, they do not factor into our analysis here.

[12] This is no insubstantial amount. In fiscal year 2022, for example, the Bureau could demand up to $734 million from the Federal Reserve. Consumer Financial Protection Bureau, *Annual performance plan and report, and budget overview* (Feb. 2022), https://files.consumerfinance.gov/f/documents/cfpb_performance-plan-and-report_fy22.pdf.

the Bureau, in effect, reduce amounts that would otherwise flow to the general fund of the Treasury, as the Federal Reserve is required to remit surplus funds in excess of a limit set by Congress. *See* 12 U.S.C. § 289(a)(3)(B).

The Bureau thus "receives funding directly from the Federal Reserve, which is itself outside the appropriations process through bank assessments." *Seila Law*, 140 S. Ct. at 2194; *see* 12 U.S.C. § 5497(a).[13] So Congress did not merely cede *direct* control over the Bureau's budget by insulating it from annual or other time limited appropriations. It also ceded *indirect control* by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process—a double insulation from Congress's purse strings that is "unprecedented" across the government. *All Am. Check Cashing*, 33 F.4th at 225 (Jones, J., concurring). And where the Federal Reserve at least remains tethered to the Treasury by the requirement that it remit funds above a statutory limit, Congress cut that tether for the Bureau, such that the Treasury will never regain one red cent of the funds unilaterally drawn by the Bureau.

This novel cession by Congress of its appropriations power—its very obligation "to maintain the boundaries between the branches," *id.* at 231— is in itself enough to give grave pause. But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books. Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains "a separate fund, . . . the 'Bureau of

---

[13] The Federal Reserve is funded through interest earned on the securities it owns and assessments the agency levies on banks within the Federal Reserve system. FEDERAL RESERVE, THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES, at 4 (2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf; *see also* 12 U.S.C. § 243.

Consumer Financial Protection Fund,'" which "shall be maintained and established at a Federal [R]eserve bank." 12 U.S.C. § 5497(b)(1). This fund is "under the control of the Director," and the monies on deposit are permanently available to him without any further act of Congress. *Id.* § 5497(c)(1). Thus, *contra* the Federal Reserve, *id.* § 289(a)(3)(B), the Bureau may "roll over" the self-determined funds it draws *ad infinitum*.

To underscore the point, the Act explicitly states that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be Government funds or appropriated monies." *Id.* § 5497(c)(2). To underscore it again, Congress expressly renounced its check "as a restriction upon the disbursing authority of the Executive department," *Cincinnati Soap*, 301 U.S. at 321, by legislating that "funds derived from the Federal Reserve System . . . shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate." *Id.* § 5497(a)(2)(C).

So the Bureau's funding is double-insulated on the front end from Congress's appropriations power. And Congress relinquished its jurisdiction to review agency funding on the back end. In between, Congress gave the Director its purse containing an off-books charge card that rings up "[un]appropriated monies." Wherever the line between a constitutionally and unconstitutionally funded agency may be, this unprecedented arrangement crosses it.[14] The Bureau's perpetual insulation from

---

[14] JUDGE JONES emphasized the perpetual nature of the funding mechanism and opined that an appropriation must be time-limited. *See All Am. Check Cashing*, 33 F.4th at 238 ("[T]he separation of powers idea underlying the Framers' assignment of fiscal matters to Congress requires a time limitation for appropriations to the executive branch."). We need not decide whether perpetuity of funding alone would be enough to render the Bureau's funding mechanism unconstitutional. Rather, the Bureau's funding

Congress's appropriations power, including the express exemption from congressional review of its funding, renders the Bureau "no longer dependent and, as a result, no longer accountable" to Congress and, ultimately, to the people. *All Am. Check Cashing*, 33 F.4th at 232 (Jones, J., concurring); *see id.* at 234 (detailing examples showing that the Bureau's "lack of accountability is not just a theoretical worry"). By abandoning its "most complete and effectual" check on "the overgrown prerogatives of the other branches of the government"—indeed, by enabling them in the Bureau's case—Congress ran afoul of the separation of powers embodied in the Appropriations Clause. *See* The Federalist No. 58 (J. Madison).

The constitutional problem is more acute because of the Bureau's capacious portfolio of authority. "It acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens." *Seila Law*, 140 S. Ct. at 2202 n.8. And the "Director's newfound presidential subservience exacerbates the constitutional problem[] arising from the [Bureau's] budgetary independence." *All Am. Check Cashing*, 33 F.4th at 234 (Jones, J., concurring). An expansive executive agency insulated (no, double-insulated) from Congress's purse strings, expressly exempt from budgetary review, and headed by a single Director removable at the President's pleasure is *the epitome* of the unification of the purse and the sword in the executive—an abomination the Framers warned "would destroy that division of powers on which political liberty is founded." 2 The Works of Alexander Hamilton 61 (Henry Cabot Lodge ed., 1904).

---

scheme—including the perpetual funding feature—is so egregious that it clearly runs afoul of the Appropriations Clause's requirements.

The Bureau's arguments to the contrary are unconvincing. First, it contends that there is no constitutional infirmity because its funding scheme was enacted by Congress. In essence, the Bureau contends that because Congress spun the agency's funding mechanism into motion when it passed the Act, voila!—the Appropriations Clause is satisfied. The Bureau's argument misreads not only Supreme Court precedent but also the plain text of the Appropriations Clause.

Start with the clause's text: "No money shall be drawn from the Treasury, but *in Consequence of Appropriations* made by law." U.S. Const. art I, § 9, cl. 7 (emphasis added). A law alone does not suffice—an *appropriation* is required. Otherwise, why not simply travel under the general procedures for enacting legislation provided elsewhere in Article I? The answer is that spending only "in Consequence of Appropriations made by law" is additive to mere enabling legislation; appropriations are required to meet the Framers' salutary aims of separating and checking powers and preserving accountability to the people. The Act itself tacitly admits such a distinction in its decree that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be . . . appropriated monies." 12 U.S.C. § 5497(c)(2). We take Congress at its word. But that is the rub.

The Bureau relies on the Supreme Court's statement that the Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Richmond*, 496 U.S. at 424 (quoting *Cincinnati Soap*, 301 U.S. at 321). But neither *Richmond* nor *Cincinnati Soap* purported definitively to map the contours of the Appropriations Clause. Regardless, Congress's mere enactment of a law, by itself, does not satisfy the clause's requirements. Otherwise, the Bureau's position means that no federal statute could ever violate the Appropriations Clause because Congress, by definition, enacts them. As discussed *supra*, our Constitution's structural separation of powers teaches us that cannot be so.

*Cf. New York v. United States*, 505 U.S. 144, 182 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment.").

The converse argument, that Congress can alter the Bureau's perpetual self-funding scheme anytime it wants, curing any infirmity, is likewise unavailing. "Congress is always capable of fixing statutes that impinge on its own authority, but that possibility does not excuse the underlying constitutional problems. Otherwise, no law could run afoul of Article I." *All Am. Check Cashing*, 33 F.4th at 238 (Jones, J. concurring); *cf. PHH Corp. v. CFPB*, 881 F.3d 75, 158 (D.C. Cir. 2018) (en banc) (Henderson, J., dissenting) ("[A]n otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future."), *abrogated on other grounds by Seila Law*, 140 S. Ct. 2183.

The Bureau also contends that because every court to consider its funding structure has deemed it constitutionally sound, we should too.[15] But carefully considering those decisions, we must respectfully disagree with their conclusion. Those courts found the constitutional scale tipped in the Bureau's favor based largely on one factor: a handful of other agencies are also self-funded. For instance, the D.C. Circuit emphasized that "Congress has consistently exempted financial regulators from appropriations: The Federal Reserve, the Federal Deposit Insurance Corporation, the Office of

---

[15] *See, e.g.*, *PHH Corp.*, 881 F.3d at 95–96; *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020); *CFPB v. Think Finance LLC*, No. 17-cv-127, 2018 WL 3707911, at *1-2 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp.*, No. 3:17-cv-101, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. ITT Educ. Services, Inc.*, 219 F. Supp. 3d 878, 896-97 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014).

the Comptroller of the Currency, the National Credit Union Administration, and the Federal Housing Finance Agency all have complete, uncapped budgetary autonomy." *PHH Corp.*, 881 F.3d at 95.

Such a comparison, focused only on whether other agencies possess a degree of budgetary autonomy, mixes apples with oranges. Or, more accurately, with a grapefruit. Even among self-funded agencies, the Bureau is unique. The Bureau's perpetual self-directed, double-insulated funding structure goes a significant step further than that enjoyed by the other agencies on offer. And none of the agencies cited above "wields enforcement or regulatory authority remotely comparable to the authority the [Bureau] may exercise throughout the economy." *All Am. Check Cashing*, 33 F.4th at 237 (Jones, J., concurring); *see also* William Simpson, *Above Reproach: How the Consumer Financial Protection Bureau Escapes Constitutional Checks & Balances*, 36 Rev. Banking & Fin. L. 343, 367–69 (2016).[16] Taken together, the Bureau's express insulation from congressional budgetary review, single Director answerable to the President, and plenary regulatory authority combine to render the Bureau "an innovation with no foothold in

---

[16] Neither is the Bureau's structure comparable to mandatory spending programs such as Social Security. The Bureau self-directs how much money to draw from the Federal Reserve; the Social Security Administration (SSA) exercises no similar discretion. *Compare* 12 U.S.C. § 5497(a)(1) (creating Bureau funding mechanism) *with* 42 U.S.C. § 415 (setting parameters for Social Security benefit levels). Quite to the contrary, SSA pays amounts Congress has determined to beneficiaries whom Congress has identified. *See* 42 U.S.C. § 415 (identifying amounts); 42 U.S.C. § 402 (identifying eligible individuals). The Executive Branch's power over "automatic" Social Security spending is therefore purely ministerial. Furthermore, Congress retains control over the SSA via the *agency's* annual appropriations. *See, e.g.*, Social Security Administration, Justification of Estimates for Appropriations Committees | Fiscal Year 2023 (2022), https://www.ssa.gov/budget/FY23Files/FY23-JEAC.pdf. Other benefits payments, including Medicare and Medicaid, the Supplemental Nutrition Assistance Program, and Temporary Assistance for Needy Families, are administered similarly by agencies subject to annual appropriations set by Congress.

history or tradition." *Seila Law*, 140 S. Ct. at 2202. It is thus no surprise that the Bureau "brought to the forefront the subject of agency self-funding, a topic previously relegated to passing scholarly references rather than front-page news." Charles Kruly, *Self-Funding and Agency Independence*, 81 Geo. Wash. L. Rev. 1733, 1735 (2013).

We cannot sum up better than Judge Jones did:

[T]he [Bureau]'s argument for upholding its funding mechanism admits no limiting principle. Indeed, if the [Bureau]'s funding mechanism is constitutional, then what would stop Congress from similarly divorcing other agencies from the hurly burly of the appropriations process? . . . [T]he general threat to the Constitution's separation of powers and the particular threat to Congress's supremacy over fiscal matters are obvious. Congress may no more lawfully chip away at its own obligation to regularly appropriate money than it may abdicate that obligation entirely. If the [Bureau]'s funding mechanism survives this litigation, the camel's nose is in the tent. When conditions are right, the rest will follow.

*All Am. Check Cashing*, 33 F.4th at 241 (Jones, J., concurring). The Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers.

**3.**

That leaves the question of remedy. Though *Collins* is not precisely on point, we follow its framework because, though that case involved an unconstitutional removal provision, we read its analysis as instructive for separation-of-powers cases more generally. *See Collins*, 141 S. Ct. at 1787–88; *cf. All Am. Check Cashing*, 33 F.4th at 241 (Jones, J., concurring) (finding *Collins* "inapt" for determining a remedy for the Bureau's "budgetary independence").

*Collins* clarified a dichotomy between agency actions that involve "a Government actor's exercise of power that the actor did not lawfully possess" and those that do not. 141 S. Ct. at 1787–88. Examples of the former include actions taken by an unlawfully appointed official, *see Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018); a legislative officer's exercise of executive power, *see Bowsher v. Synar*, 478 U.S. 714, 727–36 (1986); and the President's exercise of legislative power, *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The remedy in those cases, invalidation of the unlawful actions, flows "directly from the government actor's lack of authority to take the challenged action in the first place." *All Am. Check Cashing*, 33 F.4th at 241 (Jones, J., concurring).

In contrast, the Court found the separation of powers problem posed by an official's unlawful insulation from removal to be different. *Collins*, 141 S. Ct. 1787–88. Unlike the above examples, such a provision "does not strip" a lawfully appointed government actor "of the power to undertake the other responsibilities of his office." *Id.* at 1788. Thus, as discussed *supra* in II.B., to obtain a remedy, a plaintiff must prove more than the existence of an unconstitutional provision; she must prove that the challenged action actually "inflicted harm." *Id.* at 1789.

Into which category does the Bureau's promulgation of the Payday Lending Rule fall, given the agency's unconstitutional self-funding scheme? The answer turns on the distinction between the Bureau's *power* to take the challenged action and the *funding* that would enable the exercise of that power. Put differently, Congress plainly (and properly) authorized the Bureau to promulgate the Payday Lending Rule, *see* 12 U.S.C. §§ 5511(a), 5512(b), as discussed *supra* in II.A–C. But the agency lacked the wherewithal to exercise that power via constitutionally appropriated funds. Framed that way, the Bureau's unconstitutional funding mechanism "[did] not strip the [Director] of the power to undertake the other responsibilities

of his office," *Collins*, 141 S. Ct. at 1788 & n.23, but it deprived the Bureau of the lawful money necessary to fulfill those responsibilities. This is a distinction with more than a semantical difference, as it leads us to conclude that, consistent with *Collins*, the Plaintiffs are not entitled to *per se* invalidation of the Payday Lending Rule, but rather must show that "the unconstitutional . . . [funding] provision inflicted harm." *Id.* at 1788–89.

However, making that showing is straightforward in this case. Because the funding employed by the Bureau to promulgate the Payday Lending Rule was wholly drawn through the agency's unconstitutional funding scheme,[17] there is a linear nexus between the infirm provision (the Bureau's funding mechanism) and the challenged action (promulgation of the rule). In other words, without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule. Plaintiffs were thus harmed by the Bureau's improper use of unappropriated funds to engage in the rulemaking at issue. Indeed, the Bureau's unconstitutional funding structure not only "affected the complained-of decision," *id.* at 1801 (Kagan, J., concurring in part), it literally *effected* the promulgation of the rule. Plaintiffs are therefore entitled to "a rewinding of [the Bureau's] action." *Id.*

In considering other violations of the Constitution's separation of powers, the Supreme Court has rewound the unlawful action by granting a new hearing, *see Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018), or invalidating

---

[17] It is fairly apparent that the Bureau financed its rulemaking efforts with funds requisitioned via its unconstitutional funding mechanism. *Cf. supra* n.11. A Bureau report indicates that it spent over $9 million for "Research, Markets & Regulations" during the fiscal quarter in which the rule was issued. *See* Consumer Protection Financial Bureau, CFO update for the first quarter of fiscal year 2018 (2018), https://files.consumerfinance.gov/f/documents/cfpb_cfo-update_fy2018Q1.pdf. More granular information does not appear to be publicly available, perhaps a direct consequence of the Bureau's unprecedented budgetary independence and lack of Congressional oversight.

an order, *see NLRB v. Noel Canning*, 573 U.S. 513, 521, 557 (2014); *see also* 5 U.S.C. § 706(2)(A) (providing that, under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law"). In like manner, we conclude that the district court erred in granting summary judgment to the Bureau and in denying the Plaintiffs a summary judgment "holding unlawful, enjoining and setting aside" the challenged rule. Accordingly, we render judgment in favor of the Plaintiffs on this claim and vacate the Payday Lending Rule as the product of the Bureau's unconstitutional funding scheme.

## III.

The Bureau did not exceed its authority under either the Act or the APA in promulgating its 2017 Payday Lending Rule. The issuing Director's unconstitutional insulation from removal does not in itself invalidate the rule, and the Plaintiffs fail to demonstrate cognizable harm from that injury. Nor does the Bureau's rulemaking authority transgress the nondelegation doctrine. We therefore AFFIRM the district court's entry of summary judgment in favor of the Bureau in part.

But Congress's cession of its power of the purse to the Bureau violates the Appropriations Clause and the Constitution's underlying structural separation of powers. The district court accordingly erred in granting summary judgment in favor of the Bureau and denying judgment in favor of the Plaintiffs. We therefore REVERSE the judgment of the district court on that issue, RENDER judgment in favor of the Plaintiffs, and VACATE the Bureau's Payday Lending Rule.

AFFIRMED in part; REVERSED in part; and RENDERED.

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 19, 2024

Lyle W. Cayce
Clerk

No. 21-50826

Community Financial Services Association of America, Limited; Consumer Service Alliance of Texas,

*Plaintiffs—Appellants,*

*versus*

Consumer Financial Protection Bureau; Rohit Chopra, *in his official capacity as Director, Consumer Financial Protection Bureau,*

*Defendants—Appellees.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CV-295

## ON REMAND FROM
## THE SUPREME COURT OF THE UNITED STATES

Before Willett, Engelhardt, and Wilson, *Circuit Judges*.

Per Curiam:

This case is before us on remand from the Supreme Court. On initial review, we reversed the judgment of the district court and vacated the Consumer Financial Protection Bureau's 2017 Payday Lending Rule based on our conclusion that the Bureau's funding structure violated the Appropriations Clause. 51 F.4th 616, 635–44 (5th Cir. 2022). The Supreme

No. 21-50826

Court reversed our judgment and held that the Bureau's funding structure is constitutional. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 441 (2024). Though it reversed our judgment in its entirety, the Court did not address the other issues we decided in the case. *See* 51 F.4th at 626–35.

Accordingly, we REINSTATE our judgment affirming the district court's ruling in favor of Defendants based on Plaintiffs' alternative arguments, and we RENDER judgment in favor of Defendants declaring that the Bureau's funding structure, and thereby the Payday Lending Rule, is constitutional.

Plaintiffs shall have fourteen days after entry of this opinion to file a petition for panel rehearing. *See* Fed. R. App. P. 40(a)(1). Plaintiffs' letter filed May 16, 2024, *see* Fed. R. App. P. 28(j), is STRICKEN for noncompliance with the rule.